UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KENNETH CARROLL, ELIZABETH A. CARROLL, and CARROLL CAPITAL HOLDINGS LLC, | : : : : | Case No. 05CV 391 (LAK) |
| Plaintiffs, | : | **ECF CASE** |
| - against - | : : | **COMPLAINT** |
| LEBOEUF, LAMB, GREENE & MACRAE, L.L.P.; GRAHAM TAYLOR; CHENERY ASSOCIATES, INC.; SUSSEX FINANCIAL ENTERPRISES, INC.; CHENERY MANAGEMENT, INC.; ROY E. HAHN; HARRISMYCFO, INC.; GRANT THORNTON LLP; JAY A. BRICHKE; JAY A. BRICHKE, CPA, L.L.C.; GRAF REPETTI & CO., LLP; and DOES 1 through 20, | : : : : : : : : : : | **JURY TRIAL DEMANDED** |
| Defendants. | : : | |

Plaintiffs Kenneth Carroll, Elizabeth A. Carroll, and Carroll Capital

Holdings LLC by their attorneys Fensterstock & Partners LLP, as and for their

Complaint herein against Defendants LeBoeuf, Lamb, Greene & MacRae, L.L.P.;

Graham Taylor; Chenery Associates, Inc.; Sussex Financial Enterprises, Inc.; Chenery

Management, Inc.; Roy E. Hahn; HarrismyCFO, Inc.; Grant Thornton LLP; Jay A.

Brichke; Jay A. Brichke, CPA, L.L.C.; Graf Repetti & Co., LLP and Does 1 through 20,

allege as follows:

## NATURE OF CASE

1.      Plaintiffs bring this action against their former lawyers,

accountants, and financial advisors who, through a scheme of misrepresentations and failures to disclose material facts, caused Plaintiffs to participate in an investment and tax strategy, to pay the lawyers, accountants and financial advisors almost $2 million, and to file tax returns claiming tax benefits from the strategy that the Defendants knew or should have known would not be accepted by the Internal Revenue Service ("IRS") and state tax authorities.

2.     Plaintiffs assert claims against the Defendants for violations of the Racketeer Influenced and Corrupt Organization Act (RICO), fraud and/or negligent misrepresentations, and professional (legal and accounting) malpractice. Plaintiffs also seek to rescind fee agreements that were invalid and unethical and to have certain Defendants disgorge their improper fees.

3.     Plaintiffs seek to recover $12 million in compensatory damages, trebled under RICO, punitive damages, attorneys' fees and costs. A declaratory judgment that Defendants are liable for future damages is also sought.

**PARTIES**

4.     Plaintiffs Kenneth Carroll ("Mr. Carroll") and Elizabeth A. Carroll ("Mrs. Carroll"), both individuals, are residents and citizens of the State of New Jersey. As a married couple, Mr. and Mrs. Carroll filed joint federal and New Jersey tax returns for the 2001 and 2002 tax years. (Hereinafter, Mr. and Mrs. Carroll are jointly referred to as "the Carrolls.")

2

5.     Carroll Capital Holdings LLC ("Carroll Capital") is a Delaware limited liability company having its principal place of business in New Jersey.  Prior to changing its name on or about March 27, 2002, Carroll Capital was known as Han Kook LLC II-E.

6.     On information and belief, Defendant LeBoeuf, Lamb, Greene & MacRae, L.L.P. ("LeBoeuf") is a law firm with over 600 attorneys practicing in 13 United States cities and nine other countries.  LeBoeuf is a limited liability partnership organized under New York law and has its principal place of business in New York City, New York.

7.     On information and belief, Defendant Graham Taylor ("Taylor") is an attorney licensed to practice law in New York and California, and is a citizen and resident of California.  Until some time in around November 2002, when he joined Altheimer & Gray, Taylor was a partner in LeBoeuf's San Francisco office.  Since July 2003, Taylor has been a partner of Seyfarth Shaw LLP, which has offices in New York City, New York.  Taylor regularly transacts business within the Southern District of New York.

8.     On information and belief, Defendant Chenery Associates, Inc. ("Chenery Associates") is an active Delaware corporation with its principal place of business in San Francisco, California.  At all relevant times, Chenery Associates was and remains, a financial and tax advisor, financial services provider, and an investment,

asset, and fund manager, providing services to individuals with a high net worth. Chenery Associates regularly transacts business within the Southern District of New York.

9.     On information and belief, Defendant Sussex Financial Enterprises, Inc. ("Sussex") is a Delaware corporation having its principal place of business in San Francisco, California.  Sussex regularly transacts business within the Southern District of New York.

10.    On information and belief, Sussex was formerly known as Chenery Associates, Inc.  Sussex has assumed the liabilities and obligations of Chenery Associates and is jointly liable, along with Chenery Associates, for them.

11.    On information and belief, Chenery Associates continues to exist, have assets, and conduct business under the name Chenery Associates.

12.    On information and belief, Defendant Chenery Management, Inc. ("Chenery Management") is a Delaware corporation with its principal place of business in San Francisco, California.  Chenery Management acted as the managing member of the entities established to carry out the transactions that give rise to this  Complaint. (Hereinafter, Chenery Associates, Sussex, and Chenery Management are referred to collectively as "Chenery.")

13.    On information and belief, Defendant Roy E. Hahn ("Hahn"), an individual, is a citizen and resident of the State of California.  Hahn founded Chenery

Associates, Chenery Management, and Sussex.  Along with his spouse, Hahn is the sole owner of Chenery Associates, Chenery Management and Sussex and continues to control them.  Hahn regularly transacts business in the Southern District of New York.

14.     On information and belief, HarrismyCFO, Inc. ("HarrismyCFO") is a Delaware corporation with its principal place of business in Redwood City, California. HarrismyCFO acquired or succeeded to the business of two subsidiaries of myCFO, Inc., namely myCFO Investment Advisory Services, LLC ("myCFO Advisor") and myCFO Securities, LLC ("myCFO Broker").  HarrismyCFO assumed the liabilities and obligations of myCFO Advisor and myCFO Broker.  (Hereafter, myCFO Advisor and myCFO Broker, along with myCFO, Inc., are sometimes collectively referred to as "the myCFO entities.")

15.     On information and belief, HarrismyCFO also acquired or succeeded to some of the business of myCFO, Inc. itself.

16.     On information and belief, certain other business of myCFO, Inc. were sold or transferred to Stars Service Co. ("Stars").  myCFO, Inc. had been a Delaware corporation but has been dissolved.  The charter of Stars, also a Delaware corporation, has been voided by the State of Delaware.  (Hereinafter myCFO, Inc. and Stars are collectively referred to as "myCFO.")

17.     On information and belief, Defendant Grant Thornton LLP ("Grant Thornton") is a global accounting and consulting firm, with 585 offices (including two

in New York City), 2,270 partners, a staff of 21,500, and annual revenues of $1.84 billion. Grant Thornton is an Illinois limited liability partnership, and has it principal place of business in Chicago, Illinois.

18.     On information and belief, Defendant Jay A. Brichke is a certified public accountant licensed by both the State of New York and the State of New Jersey and is a resident and citizen of the State of New Jersey.  Jay A. Brichke regularly transacts business in the Southern District of New York.

19.     On information and belief, Jay A. Brichke formed a New Jersey limited liability company, Jay A. Brichke, CPA, L.L.C., and provided accounting and tax preparation services as an employee or member of that firm.  At all relevant times, Jay A. Brichke, CPA, L.L.C. has had an office in New York City and regularly transacted business in the Southern District of New York and continues to do so.  (Hereinafter, Jay A. Brichke and Jay A. Brichke, CPA, L.L.C. are collectively referred to as "Brichke.")

20.     On information and belief, Defendant Graf Repetti & Co., LLP ("Graf Repetti") is a firm that provides tax and accounting services, with its principal place of business in New York, New York.  Prior to June 30, 2004, when its registration was withdrawn and revoked, Graf Repetti was a New York limited liability partnership ("LLP"); the revocation of its LLP status means it is now a general partnership by operation of law.

21.     On information and belief, during the relevant time, Brichke

6

became a member, partner or employee of Graf Repetti.

22.     Plaintiffs are uncertain of the true names and capacities of certain other individuals or entities that may be liable for the damages and injury alleged herein and therefore sue them as Does 1 through Does 20.  Plaintiffs are uncertain of the true names and capacities of the Doe Defendants because the Defendants have cloaked the roles and identities of some of their co-conspirators in secrecy and have failed to disclose all of the parties involved in their conspiracy and the transactions alleged herein.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action under (a) 28 U.S.C. § 1331 because the RICO claim, which arises under 18 U.S.C. §§ 1961 *et seq.*, presents a federal question, and (b) 28 U.S.C. § 1367 because the remaining state law claims are so related to the RICO claim that they form a part of the same case or controversy and fall within this Court's supplemental jurisdiction.

24.     Venue is proper in this District under (a) 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred within this District and acts in furtherance of the conspiracy alleged herein occurred within this District, and (b) 18 U.S.C. § 1965 because the Defendants may be found in this District, each has an agent in this District and each transacts affairs in this District.

25.     Venue in this District also is proper as to Chenery Management

because it consented to the jurisdiction of this Court and venue within this District in a contract with Plaintiffs.

## FACTUAL BACKGROUND

26.     Chenery's business, and that of Hahn, included developing and promoting tax strategies designed to allow persons to legally avoid paying taxes. At some point, their products began to include tax strategies that were, or were known by them to be likely to become, "listed transactions," that is, transactions subject to the list maintenance requirements of Section 6112 of the Internal Revenue Code, 26 U.S.C. § 6112, because the IRS considers them to be potentially abusive tax shelters as defined in 1984 amendments to the Internal Revenue Code or regulations promulgated by the IRS.

27.     One of the tax products that Chenery and Hahn developed involved non-performing loans made by banks outside the United States. (Hereinafter, these products are referred to as "NPL Strategies.")

28.     On information and belief, some of the tax products Chenery and Hahn developed, including NPL Strategies, were designed with the assistance of LeBoeuf and Taylor. In particular, Taylor, who marketed himself as an expert with respect to international tax issues, international transactions, international non-performing loans and the representation of high-net-worth individuals in international investments, participated in the design of the NPL Strategies. The role of LeBoeuf and

Taylor in promoting these tax products also included providing so-called "plain English" letters summarizing the structure of the transactions for persons who would be solicited to participate in them and providing opinion letters regarding the validity of the strategy under U.S. tax laws.  LeBoeuf and Taylor provided such summaries and opinion letters for the NPL Strategies that they, Chenery and Hahn promoted.  In addition, the role of LeBoeuf and Taylor included providing a range of legal services and legal advice, including tax advice, on the NPL Strategies.

29.    On information and belief, LeBoeuf, Taylor, Hahn, and Chenery sought the assistance of  R.J. Ruble ("Ruble"), another lawyer who represented himself as a tax expert, in developing and promoting some of the tax products that Chenery, Hahn, LeBoeuf, and Taylor had developed or begun to develop.

30.    On information and belief, assistance from Ruble was sought in part because Taylor, LeBoeuf, Hahn, and Chenery recognized that the role LeBoeuf and Taylor had played in developing the NPL Strategies would mean that the IRS could take the position that clients would be unable to rely on opinion letters from LeBoeuf and Taylor if the IRS challenged the validity of those strategies.

31.    Ruble, then a partner of Sidley Austin Brown & Wood ("Sidley"), an international law firm with an office in New York where Ruble worked, agreed to provide opinion letters that would attest to the lawfulness of the NPL Strategies, as well as other tax strategies to be marketed and promoted by Chenery, Hahn, LeBoeuf,

Taylor, and others.

32.    On information and belief, Ruble was aware that other lawyers who were promoting tax strategies had more lucrative compensation arrangements with their law firms than he had with Sidley.  Ruble desired to increase his personal compensation at the expense of his partners and law firm.  To do so, Ruble arranged to receive 20% of the gross proceeds generated by Chenery on transactions in which he and Sidley provided legal opinions.

33.    On information and belief, Chenery agreed to pay, and did pay, Ruble a portion of the proceeds on transactions marketed or promoted by Chenery on which Sidley and Ruble provided legal opinions.

34.    The arrangement described in Paragraphs 32 and 33 above was not disclosed to the Carrolls.  To the contrary, the Carrolls were told to pay Ruble and Sidley their fees directly.

35.    Initially, Chenery informed the Carrolls that its fee would be $900,000 and that Chenery would pay Sidley and Ruble a portion of the $900,000.  However, by early December 2001, the Carrolls were informed that they should directly pay Sidley and Ruble a fee of $250,000 and Chenery's fee would decrease to $650,000 as a result.  Neither Chenery nor anyone else told the Carrolls that Chenery would kickback a portion of its fees to Ruble.

36.    On information and belief, Chenery, Hahn, LeBoeuf, and/or Taylor

sought assistance from Grant Thornton in developing and marketing the NPL Strategies.  In addition, in return for a portion of Chenery's fees and in return for being included in various tax strategies the others were marketing, Grant Thornton agreed (a) to prepare tax documents for entities established by Chenery in order to implement the NPL Strategies, including the strategy that is the subject of this complaint, (b) to prepare the tax documents as if the strategies were valid, (c) not to disclose to persons who participated in the strategies any concerns Grant Thornton might have about the validity of the strategies, and (d) to market the strategies to its clients.

37.    On information and belief, Grant Thornton has participated in developing and marketing a number of tax strategies that the IRS regards as listed transactions.  After receiving an IRS summons pertaining to one such strategy known as the "Guam Strategy," Grant Thornton allegedly withdrew from further participation in that strategy.  The IRS has suggested in court papers that Grant Thornton has been involved with at least 16 other transactions that are, or might be, listed transactions. Grant Thornton marketed and promoted a number of tax strategies that were listed in a "Client Solutions Matrix."

38.    On information and belief, Chenery, Hahn, LeBoeuf, Taylor, and Grant Thornton also sought the assistance of other firms that represented a significant number of individuals with a high net worth.  Such firms could identify potential investors to whom the tax strategies and NPL Strategies could be marketed and who

11

would pay Chenery, Hahn, Taylor, LeBoeuf, and Grant Thornton large fees.

        39.    On information and belief, among the firms that Chenery, Hahn, Taylor, LeBoeuf, and Grant Thornton enlisted in their plan were myCFO, myCFO Advisor and myCFO Broker, which provided a full range of financial and accounting services to high-net-worth individuals.  (Hereinafter, Chenery, Hahn, Grant Thornton, LeBoeuf, Taylor, Sidley, Ruble, and the myCFO entities are sometimes collectively referred to as the "Promoters.")

        40.    On information and belief, to carry out their plan, the Promoters agreed that any one of them who communicated or met with potential and/or actual participants or investors who would be solicited to participate in their tax strategies, including the NPL Strategies, would and could act as agent of the other Promoters, and make representations regarding the role, work, opinions, and views of the other Promoters.

        41.    On information and belief, the Promoters also agreed among themselves not to disclose certain facts to persons being solicited to participate in the NPL Strategies and other tax strategies; the facts the Promoters agreed not to disclose included their role as "promoters" as that term is used in the Internal Revenue Code and IRS regulations relating to tax shelters, and the consequences that role could have on the ability of investors to rely on their opinions and advice.

        42.    Two consequences of lawyers or accountants acting as "promoters"

of a tax shelter are that (a) the IRS could contend that the investors/taxpayers could not rely on the advice and opinion letters of the lawyers and accountants to avoid the imposition of tax penalties or to persuade the IRS of the correctness of the tax treatment set out in the opinion letters or the advice provided by the promoters; and (b) the attorney-client and accountant-taxpayer privileges could be impaired or pierced.

43.     On information and belief, the Promoters also agreed among themselves not to disclose that the Promoters were acting in concert with each other in promoting tax strategies, including NPL Strategies.

44.     Each of the Promoters sought to benefit from, and has benefited from, the misrepresentations, omissions and concealments of the other Promoters and so has adopted those misrepresentations, omissions and concealments.

45.     In about mid-October 2001, myCFO, acting as representative and agent of all of the Promoters and acting with their authority and knowledge, approached the Carrolls' financial adviser, Crestone Capital Advisors LLC ("Crestone"), to ask if any of Crestone's clients might be interested in investing in portfolios of non-performing loans.  In particular, myCFO, acting as representative and agent of all of the Promoters and acting with their authority and knowledge, with the intention that Crestone would pass the representations on to its clients and that those clients would rely on them, represented to Crestone that:

a.      Chenery was the manager of an investment strategy involving distressed,

non-performing  Asian loans (the "Asian NPL Strategy");

b.      This Asian NPL Strategy provided clients the opportunity to earn significant profits and to control their investments;

c.      In addition, this Asian NPL Strategy provided an opportunity for clients to lawfully avoid paying taxes if they had gains that could be used to offset losses that might be incurred in carrying out the strategy; and

d.      The Asian NPL Strategy would be backed up by two formal "should level" opinion letters from firms with tax expertise —LeBoeuf and Sidley.

46.     Based upon myCFO's presentation, Crestone suggested to Mr. Carroll that he consider participating in the Asian NPL Strategy.

47.     On or about October 31, 2001, Mr. Carroll participated in a telephone call with Larry Nealy ("Nealy") and Jim Dee ("Dee") of myCFO and representatives of Crestone, among others.  Nealy and Dee were acting as representatives and agents of all the Promoters and with their knowledge and authority.  The conference call concerned Mr. Carroll's possible participation in the Asian NPL Strategy.

48.     Shortly thereafter, on November 2, 2001, Nealy, acting as the representative and agent of the Promoters and with their knowledge and authority, participated in another telephone call with Mr. Carroll.

49.     During the foregoing telephone calls, Nealy and Dee, acting as the

14

agents and representatives of all the Promoters and with their knowledge and authority, represented to Mr. Carroll that:

a.   The Asian NPL Strategy offered clients an opportunity to diversify investments, to earn significant profits and to exercise greater control over their investments, including the selection and timing of investments, in part because any one fund would be limited to a single investor;

b.   The Asian NPL Strategy had a lower fee structure than other investment opportunities;

c.   In addition, the Asian NPL Strategy provided an opportunity for clients to lawfully avoid paying taxes if they had gains that could be used to offset losses that might be incurred in carrying out the strategy;

d.   The tax savings would occur because the distressed assets that the taxpayer would purchase carried a built-in loss;

e.   The Asian NPL Strategy was a "strong" tax strategy;

f.   A written legal opinion by an independent, objective blue chip law firm, Sidley, and its experienced tax partner Ruble, would attest that the tax treatment of the Asian NPL Strategy "should" be upheld by the IRS and courts; and

g.   Throughout the transaction, the Carrolls would be represented by a second independent, objective blue chip law firm, LeBoeuf, and its

15

experienced tax partner Taylor, who would advise them on all legal issues that arose in connection with the investment and its tax treatment, and who also would provide a "should level" opinion testifying that the tax treatment of the Asian NPL Strategy should be upheld by the IRS and courts.

50.   The fact that the promised opinion letters would be "should" opinions, rather than "more likely than not" opinions, was important to the Carrolls and was relied upon by them in deciding to invest in the Asian NPL Strategy.  "Should" opinions are stronger opinions and demonstrate that the law firm is more confident in the validity of the tax strategy being discussed in the opinion.

51.   In fact, on October 31, 2001, Nealy and Dee, acting as the agents and representatives of all the Promoters and with their knowledge and authority, had represented to Mr. Carroll that a "should" opinion meant that there was at least an 80% assurance that the taxpayer's position would be sustained if the IRS challenged a transaction.

52.   In addition, both Nealy and Taylor subsequently told Mr. Carroll or Crestone personnel that Sidley usually issued "more likely than not opinions" but would issue a "should" opinion on the Asian NPL Strategy because of the strength of the strategy.

53.   During the October 31 and November 2, 2001 telephone calls, and

16

in subsequent communications, Mr. Carroll was assured by Nealy and Taylor, and possibly by other of the Promoters, that he was completely and absolutely protected against the imposition of penalties.

54.     In addition, during the foregoing meetings and telephone calls, Nealy and Dee, acting as representatives and agents of all of the Promoters and with their knowledge and authority, told Mr. Carroll that there were several different distressed loan pools he could invest in, that Chenery would provide him with due diligence material on the various loan pools, and that he could choose the loan pool that he wanted to invest in.

55.     In reasonable reliance on the foregoing representations and omissions made by Nealy and Dee on behalf of all of the Promoters, the Carrolls decided to participate in the Asian NPL Strategy.

56.     These representations set out in Paragraphs 45, 49, and 51 through 53 were false and misleading in several respects, including the following:

a.      As the Promoters knew or should have known, the IRS would contend that the Asian NPL Strategy, as the Promoters would ultimately structure it without the knowledge of the participants, did not offer a lawful opportunity to avoid paying taxes and there was no reasonable basis for concluding that a taxpayer should prevail in the event of an IRS challenge;

b.      Neither LeBoeuf nor Taylor was independent or objective; further, they

17

had a pecuniary interest in luring clients, including the Carrolls, into participating in the Asian NPL Strategy;

c.    Neither Sidley nor Ruble was independent or objective; further, they had a pecuniary interest in luring clients, including the Carrolls, into participating in the Asian NPL Strategy;

d.    Because of the role of LeBoeuf and Taylor as "promoters," the IRS could contend that the advice and opinion letters from LeBoeuf and Taylor did not protect the Carrolls from the imposition of penalties; and

e.    Because of the role of Sidley and Ruble as "promoters," the IRS could contend that the Sidley/Ruble opinion letter did not protect the Carrolls from the imposition of penalties.

57.    At the direction of and with the knowledge of the Promoters and acting as their agents and representatives, during these communications, Nealy and Dee concealed from Mr. Carroll the following material facts:

a.    The Asian NPL Strategy had similarities to other tax strategies already rejected by the IRS and listed by the IRS as potentially abusive tax shelters;

b.    LeBoeuf and Taylor had already prepared "canned" opinions attesting to the ability of clients to rely on Sidley's opinion regarding the propriety of the Asian NPL Strategy, and needed only to fill in a few blanks particular to each client's transaction;

18

c.      Sidley and Ruble had already prepared "canned" opinions attesting to the propriety of the Asian NPL Strategy, and needed only to fill in a few blanks particular to each client's transaction;

d.      The role of myCFO, myCFO Advisors, myCFO Brokers, LeBoeuf, Taylor, Sidley, Ruble, and Grant Thornton as "promoters";

e.      The consequences of that role;

f.      The role that LeBoeuf and Taylor had played in developing the NPL Strategies would mean that the IRS could take the position that clients would be unable to rely on opinion letters from LeBoeuf and Taylor if the IRS challenged the validity of those strategies; and

g.      The Promoters were acting in concert with each other.

58.     In reasonable reliance on the foregoing representations and omissions set forth above, on or about November 5, 2001, Mr. Carroll signed an engagement letter with LeBoeuf and Taylor for them to act as the Carrolls' counsel regarding their participation in the Asian NPL Strategy and paid LeBoeuf $80,000 in fees on or about December 5, 2001.  The LeBoeuf/Taylor engagement letter did not correct the misrepresentations set out in Paragraphs 45, 49, 51 through 53 *supra* and did not disclose the material facts that had been concealed and that are set forth above in Paragraph 57 *supra*.  Nor did LeBoeuf or Taylor otherwise correct them.

59.     The LeBoeuf/Taylor engagement letter placed no restrictions on the

scope of the work to be done by them.  To the contrary, the letter represented that LeBoeuf and Taylor would "act as your legal counsel concerning your potential participation in the distressed assets program of Chenery Associates."  The letter went on to state that LeBoeuf and Taylor would act as counsel but not "as principal tax counsel."  Thus, the letter promised that LeBoeuf and Taylor would provide tax advice and represented only that they would not be the "principal" tax attorneys on the transaction.

60.     The Carrolls understood that LeBoeuf and Taylor would provide complete legal representation with respect to the strategy and their investment.

61.     LeBoeuf and Taylor agreed to, and were required to, provide the Carrolls with any tax advice, knowledge, conclusions and opinions regarding the Asian NPL Strategy, especially if their advice, knowledge, conclusions and opinions were different in any respect from that of the "principal" tax counsel.

62.     In fact, throughout the period from November 2001 through at least the end of 2002, when questions developed about tax issues arising out of the Carrolls' participation in the Asian NPL Strategy, those questions were raised with Taylor, who provided advice on federal tax issues.

63.     In or around December 2001, myCFO Advisor and myCFO Broker represented in a memorandum sent to Mr. Carroll, on behalf of all the Promoters, that the team Chenery had assembled for participants in the Asian NPL Strategy included

the LeBoeuf and Sidley law firms and that the team's members would continue to provide services for participants in the Asian NPL Strategy for a period of five years. The memorandum specifically stated that the compensation paid to attorneys included the services they would provide over that five-year period.

64.     Thus, LeBoeuf and Taylor agreed to provide legal advice to the Carrolls for a five-year period ending in November 2006 and assumed the continuing duty to advise them honestly, competently and professionally, with respect to the tax issues arising out of the Asian NPL strategy.

65.     In reasonable reliance on the foregoing representations and omissions set forth above, on or about December 5, 2001, Mr. Carroll engaged Chenery and paid Chenery Associates a $650,000 fee. Prior to being engaged, Chenery and Hahn knowingly and intentionally did nothing to correct the misrepresentations and omissions set forth above in Paragraphs 45, 49, 51 through 53, 57, 59, and 61 through 64 *supra.*

66.     In letters dated December 3, 2001 (addressed to Chenery) and December 7, 2001 (advising Mr. Carroll he could rely on the December 3 letter), Taylor and LeBoeuf represented that the IRS "should have no reasonable basis … to disallow any significant portion of the expected Federal income tax benefits of the transaction, inasmuch as any loss passing from the NPL Investment to [Mr. Carroll] relies solely on the basic principals of [Internal Revenue] Code Sections 723, 1001, and 704 and should

21

not be denied based on any of the judicially developed doctrines of 'sham transaction,' 'business purpose,' or 'economic substance.'"  The letter stated that there was a "general accepted understanding that the principles of Sections 723, 1001, and 704 [of the Internal Revenue Code] should provide the expected Federal income tax benefits from the NPL Investment.  As a result, the NPL investments should not constitute a transaction with 'a significant purpose of avoidance or evasion of Federal income tax.'"

67.    This letter also advised that the Asian NPL Strategy was not included on any IRS list of "listed transactions" nor had the NPL Strategy "been determined to be a 'listed transaction' pursuant to regulations issued by the Treasury [Department]."  The letter repeated its conclusion that the NPL Strategy "should not constitute a transaction with a significant purpose of avoidance or evasion of Federal income tax."

68.    Nothing in the aforementioned two December 2001 letters corrected the misrepresentations that had been made earlier or disclosed the material facts that had been concealed, as set forth above in Paragraphs 45,, 49, 51 through 53, 57, 59 and 61 through 64 *supra*.

69.    In reasonable reliance on the foregoing representations and material omissions set forth above, on or about December 12, 2001, Mr. Carroll signed an engagement letter with Sidley and Ruble for them to act as tax counsel regarding his participation in the Asian NPL Strategy.  Mr. Carroll paid Sidley $250,000 in fees on or

about December 5, 2001.

70.     On or about December 7, 2001, Taylor and LeBoeuf sent Mr. Carroll a draft "plain English" explanation "concerning the legal and structural aspects of [his] proposed investment in the Distressed Assets Program of Chenery Management."  On or about December 13, 2001, Taylor and LeBoeuf sent a final version of that letter.  The letters' stated purpose was to advise Mr. Carroll "generally as to the structure of the transaction, explain the important terms of the documents involved in the investment, and the major risks associated therewith" and to "assist [him] to make an informed business decision in proceeding with the proposed investment."

71.     The Taylor/LeBoeuf "plain English" letters identified the risks involved with investing in distressed assets as "legal risks, enforcement risks, investment and market risks."  No mention was made of tax risks anywhere in the document, including the discussion of legal risks.

72.     The "plain English" letters sent by Taylor and LeBoeuf represented that the investment was a legitimate investment strategy and had potential rates of return that were significant.  The letter noted that third-party valuation reports by reputable accountants and valuation experts, such as PricewaterhouseCoopers and Houlihan Valuation Advisers, and legal due diligence reports by lawyers, would be provided, making clear that the investments had significant and legitimate financial purposes and potential returns.

73.     Nothing in the Taylor/LeBoeuf "plain English" letters corrected the misrepresentations made earlier, set out in Paragraphs 45, 49, 51 through 53, 59, 61 through 64, 66 and 67 *supra,* or disclosed the material facts that had previously been concealed, set out in Paragraph 57 *supra.*

74.     On December 12, 2001, Taylor participated in a telephone call with the Carrolls and others.   During this call, the representations set out above were repeated and none of the material facts that had been concealed were disclosed.   The Carrolls were assured by Taylor that the Asian NPL Strategy was "totally legitimate" and "legal" and that with the "should level" opinions LeBoeuf and Sidley would provide, the Carrolls were completely protected against penalties.

75.     In reasonable reliance on the foregoing representations and omissions set forth above, Mr. Carroll agreed to participate in the Asian NPL Strategy and to do so he  purchased Korean Development Bank's interest in Han Kook LLC II-E ("Fund II") for $454,759, on or about December 17, 2001 and, on or about December 24, 2001, executed a subscription agreement to  invest an additional $1 million in Fund II. Mr. Carroll subsequently made that investment.

76.     Throughout December 2001, Mr. Carroll still had the ability to withdraw from the program and not to  invest any additional funds.

77.     He did not do so based on the representations he  previously had, and subsequently, received and his lack of knowledge of material facts that the

Promoters had failed to disclose.

78.     On or about December 5, 2001, Chenery had arranged for the Korean Development Bank ("KDB") to transfer an interest in certain distressed loans to Han Kook LLC I-E ("Fund I") to which Chenery Management contributed cash. Chenery Management became Fund I's managing member in return for a membership interest in Fund I, a Delaware limited liability company.  KDB obtained a membership interest in Fund I in return for KDB's contribution of the distressed loans.

79.     At around the same time, KDB contributed a 98% interest in Fund I to Han Kook LLC II-E ("Fund II"), also a Delaware limited liability company, in return for a 99% membership interest in Fund II.  Chenery Management became the manager of Fund II in return for a 1% membership interest in Fund II.

80.     At around the same time, Chenery made arrangements for Mr. Carroll to purchase KDB's membership interest in Fund II, an LLC.

81.     After these arrangements were made, Chenery notified Mr. Carroll that some additional investment opportunities had recently become available.  Chenery did so in a December 10, 2001 letter, signed by Hahn.  This letter represented that the strategy was a legitimate strategy and offered potential rates of returns that were significant.  The letter noted that third party valuation reports by reputable accountants and valuation experts, such as PricewaterhouseCoopers and Houlihan Valuation Advisers, and legal due diligence reports by lawyers, would be provided, making clear

that the investments had significant and legitimate financial purposes and offered significant potential returns. [1]

82.    Among the additional opportunities discussed in Chenery's December 10 letter were loan pools originated by China Cinda Asset Management Corporation, China Orient Asset Management, and Bank Mandiri; an equity position in Daewoo Motors; an interest in Touchstone Capital Partners; and an interest in Dillon Low Val Strategies.  Due diligence reports on these investments were offered.  Chenery encouraged Mr. Carroll to examine these alternative investments.

83.    On or about December 17, 2001, Mr. Carroll purchased KDB's membership interest in the Fund II LLC.

84.    Almost immediately, discussions began about the arrangements needed for Mr. Carroll to replace Chenery as the managing member of Fund II.

85.    Mr. Carroll continued to consider the investment alternatives Chenery had presented, discussing them with myCFO and myCFO Advisor.

86.    On or about December 21, 2001, Mr. Carroll elected to have Fund II to cause Fund I  exchange its interest in the KDB loans for an interest in loan pools originated by China Orient because he believed those loans offered a better opportunity

---

[1]    The Chenery/Hahn letter was sent on behalf of and with the knowledge and authority of all the Promoters in order to induce investors, such as the Carrolls, to make all of the payments necessary to participate in the Asian NPL Strategy and to enrich the Promoters.

of recovery at a lower cost.

87.     On or about December 26, 2001 Chenery exchanged Fund I's interest in KDB loans for an interest in Chinese loans.[2]

88.     At no point prior to Mr. Carroll's directing Chenery to swap the interest in distressed loans originated by KDB for distressed loans originated by China Orient or prior to the actual swap of Korean loans for Chinese loans, or at anytime thereafter, did Chenery, Hahn, myCFO, myCFO Advisor, myCFO Broker, LeBoeuf, Taylor, or Grant Thornton inform Mr. Carroll or his advisors at Crestone that:

a.     Engaging in the swap in December 2001 presented significant tax risks;

b.     Mr. Carroll would be in a better tax position with respect to the IRS if he continued to hold his interest in the KDB loans for a longer period of time;

c.     The price at which the swap would occur did not reflect market developments;

d.     In fact, the Promoters had choreographed Mr. Carroll's swap of loans with swaps of loans by other clients the Promoters had lured into the Asian NPL Strategy so that the various clients were simply playing "musical chairs," exchanging loan pools among a limited number, and closed

---

[2]     Although Mr. Carroll instructed Chenery to cause Fund I to exchange the KDB loans for loans held by China Orient, Chenery exchanged them for loans held by China Cinda.  Mr. Carroll objected to these actions and Chenery ultimately corrected the transaction.

group, of clients; and

e.    This "musical chairs" swap presented significant tax risks, made it possible that the IRS would designate the Asian NPL Strategy as a listed transaction and made it unlikely that the Carrolls "should" prevail in any IRS challenge as Taylor and LeBoeuf had opined and would continue to opine the Carrolls would.

89.    Sometime prior to December 2001, when Chenery was the managing member and designated tax matters partner of Fund I and of Fund II, Chenery had engaged Defendant Grant Thornton to serve as the accountant and tax preparer for Fund I and Fund II.

90.    On or about December 28, 2001, Mr. Carroll replaced Chenery as the managing member of Fund II, but not as the designated tax matters partner.

91.    Grant Thornton had acted as the accountant and tax preparer for a company Mr. Carroll had worked for, and had prepared the Carrolls' tax returns for the 2000 calendar year.  Grant Thornton had provided tax advice to the Carrolls in connection with the sale of Mr. Carroll's interest in a business.

92.    As a result, the Carrolls relied on Grant Thornton to accurately prepare Fund II's 2001 tax returns, including K-1 Forms for its members, includingthemselves.

93.    On or about January 1, 2002, Mrs. Carroll acquired from Chenery

the 1 percent equity interest that Chenery held in Fund II.

94.     At all times since December 28, 2001, Mr. Carroll has remained the managing member of Fund II.

95.     Since Mr. Carroll acquired an interest in Fund II, all profits of Fund II have been distributed only to the Carrolls.

96.     Subsequently, on or about March 27, 2002, the Carrolls caused Fund II to change its name from Han Kook LLC II-E to Carroll Capital Holdings LLC ("Carroll Capital").

97.     The Carrolls continue to be members of Carroll Capital and to use that LLC as the vehicle for carrying out the various investments they make.

98.     In telephone conversations with Mr. Carroll on April 12, 2002, after he had reviewed drafts of the opinion letter Sidley and Ruble would ultimately issue ("the Sidley Opinion"), Taylor, acting as the agent and representative of all the Promoters and with their knowledge and authority, told Mr. Carroll that the transaction was strong, that he (Taylor) had never seen a transaction that was more defensible, and that the Sidley Opinion would protect against any penalties if the IRS challenged the Asian NPL Strategy.

99.     On or about August 27, 2002, LeBoeuf and Taylor, with the knowledge and authority of the other Promoters, issued a written opinion dated June 7, 2002 (the "LeBoeuf Opinion") to Mr. Carroll.  The LeBoeuf Opinion expressly addressed

whether the Sidley Opinion would protect Mr. Carroll from the imposition of penalties in the event that it was ultimately determined that the tax treatment of the Asian NPL strategy recommended by the Promoters was improper.

100.    In the LeBoeuf Opinion, Taylor and LeBoeuf stressed the point that the Sidley Opinion was a "should" opinion.

101.    In rendering the LeBoeuf Opinion, LeBoeuf and Taylor represented that they had reviewed the authorities referenced in the Sidley Opinion.

102.    The Sidley Opinion represented that, in light of the relevant rulings of the IRS and U.S. federal courts:

a.      KDB had an equity interest in Fund I and Fund II and both funds would be classified as a partnership;

b.      KDB's basis in the loans it contributed to Fund I was not less than an amount specified in the Sidley Opinion;

c.      "No gain or loss should be recognized" by KDB when it transferred loans to Fund I or its Fund I interest to Fund II;

d.      "Fund I's tax basis in the Loans should equal the tax basis of the Loans in KDB's hands immediately before their contribution to Fund I.";

e.      "The transfer of KDB's Fund I interest to Fund II and the acquisition of the Fund II interest by [Mr. Carroll] from KDB should not change the basis of Fund I's Loans.";

f.     "No gain or loss should be recognized by [Mr. Carroll] with respect to any assets contributed by [him] to Fund II.";

g.     "[Mr. Carroll's] initial tax basis in  [his] membership interest in Fund II should be equal to the amount paid by [him] to KDB for KDB's interest in Fund II and should be increased by the amount of cash and the tax basis of other assets contributed by [him] to Fund II, including any fees and expenses required to be capitalized into the Fund II interest.";

h.     "Loss recognized on the sale of or exchange of Loans should be treated in whole or in part as a long term capital loss.";

i.     "Under [Internal Revenue] Code Section 704(c), a portion of the loss arising on the disposition of the Loans by Fund I up to the amount by which the tax basis of the such Loans exceeded their fair market value at the time of the contribution of the Loans by KDB to Fund I should be allocated to [Mr. Carroll] as an acquirer and holder of a portion of KDB's interest in Fund II for the year in which the disposition occurs.";

j.     "With respect to the application of certain loss limitation rules potentially affecting the deductibility of any loss claimed by [Mr. Carroll] in connection with the Transactions:

i)     "The IRS should be unsuccessful were it either to assert under Treas. Reg. § 1.701-2 that the Transactions are inconsistent with the

intent of subchapter K or to assert that either Fund I or Fund II should be disregarded entirely under Treas. Reg. § 1.701-2 or under common law principles";

ii) "[Mr. Carroll's] share of loss recognized by Fund I on the sale or exchange of Loans should not be limited by [Internal Revenue] Code section 704(d).";

iii) "The step transaction doctrine should not apply to the Transactions";

iv) "The sham transaction doctrine should not apply and, based on [Mr. Carroll's] representations, the Transactions would have the requisite business purpose and economic substance";

v) "Based on [Mr. Carroll's] representations and the information available to us, the requisite profit motive should exist to support the deduction of any loss from the Transactions under Code Section 165(c)(2)";

vi) "Any loss that [Mr. Carroll] incurs from the Transactions should not be limited by the Code Section 465 'at risk rules'";

vii) "Any loss that [Mr. Carroll] incurs from the Transaction should not be subject to the limitations under Code Section 469"; and

viii) "Code Section 482 should not be applicable to the Transactions.";

k.     "Based upon the foregoing, the tax treatment of the Transactions should be upheld if challenged by the IRS."; and

l.     "Based upon the foregoing, the IRS should not be successful were it to assert a penalty against [Mr. Carroll] under Code Section 6662(b)(2) or (3) for positions taken on [his] U.S. federal income tax return with respect to the Transactions as [Mr. Carroll] has 'Substantial Authority' for each and every position and opinion discussed above.

103.    While the LeBoeuf Opinion states that Mr. Carroll had not asked LeBoeuf and Taylor to determine "whether we would issue the same opinion or analyze each issue in the same manner as the [Sidley] Opinion," in fact, Mr. Carroll had previously asked Taylor and LeBoeuf to advise Mr. Carroll as to the tax risks associated with the Asian NPL Strategy and Taylor had done so, assuring Mr. Carroll that the tax risks were minimal and the tax treatment proposed by Sidley and the other Promoters should be upheld. Further, LeBoeuf and Taylor had already told the Carrolls in writing that they could rely on the December 2001 "should level" opinion by LeBoeuf addressed to Chenery.

104.    As a result, after receiving the LeBoeuf Opinion in August 2002, Mr. Carroll did not request an additional formal opinion letter from LeBoeuf or Taylor.

105.    Moreover, as will be discussed, Taylor was subsequently asked if he and his firm would issue the same opinion as Sidley and Ruble had, and Taylor said

that he and his law firm would do so.

106.    Based on the scope of the engagement LeBoeuf and Taylor had agreed to undertake for the Carrolls, LeBoeuf and Taylor had a duty to independently assess the strength of the authorities relied upon by Sidley in its opinion and to consider whether the conclusions of the Sidley Opinion were warranted and valid.  LeBoeuf and Taylor also had a duty to inform the Carrolls if LeBoeuf and Taylor disagreed in any way with the Sidley Opinion and conclusions or assessed the risks associated with the Asian NPL Strategy differently than Sidley and Ruble had.

107.    LeBoeuf and Taylor never informed the Carrolls that LeBoeuf and Taylor disagreed in any way with the Sidley Opinion and conclusions or had assessed the risks associated with the Asian NPL Strategy differently than Sidley and Ruble.

108.    The LeBoeuf Opinion also concluded that even if it were subsequently determined that the Carrolls could not avail themselves of the tax treatment proposed by Sidley, Ruble, and the other Promoters, Mr. Carroll "should not be liable for any accuracy related penalties pursuant to Internal Revenue Code Section ('Section') 6662" and "if you are liable for additional income tax on the Transactions, you should not be liable for any penalties under section 6662 attributable to negligence or an understatement of income tax."

109.    The LeBoeuf Opinion contained numerous material misrepresentations and omissions, including the following:

a.   The LeBoeuf Opinion failed to disclose that LeBoeuf and Sidley had already prepared "canned" opinion letters, and needed only to fill in a few blanks (such as name, address, date and amount of transaction) to "customize" them for each client;

b.   The LeBoeuf Opinion omitted the consequences of that fact;

c.   The LeBoeuf Opinion failed to disclose the role of the Promoters, including Sidley, Ruble, Taylor and LeBoeuf, on whose opinion letters the Carrolls would reasonably rely, as promoters;

d.   The LeBoeuf Opinion failed to disclose that as a result the IRS could contend that none of the opinions the Carrolls had received (the Sidley Opinion, the LeBoeuf Opinion and the December 2001 LeBoeuf Opinion addressed to Chenery) provided protection against penalties;

e.   The LeBoeuf Opinion failed to disclose or even discuss the potential adverse consequences of the swap of Korean loans for Chinese loans in December 2001, or that the swaps of debt among the Promoters' various clients had been choreographed by the Promoters and did not occur in an open, independent market, or the potential adverse consequences of those facts; and

f.   The LeBoeuf Opinion failed to cure any of the deficiencies and misrepresentations in the Sidley Opinion.

110.    The LeBoeuf Opinion also failed to cure the misrepresentations and omissions made to Mr. Carroll that are set forth above in Paragraphs 45, 49, 51 through 53, 57, 59, 61 through 64, 66, 67, 70 through 72, 74, 81, 88, and 98 *supra*.

111.    The LeBoeuf Opinion also did not amend or retract any of the representations and advice Taylor and LeBoeuf had provided to Mr. Carroll in letters dated December 3, 2001 (addressed to Chenery) and December 7, 2001 (advising Mr. Carroll he could rely on the December 3 letter) or in telephone conversations or e-mails.

112.    On or about July 10, 2002, Grant Thornton, with the knowledge and endorsement of all the Promoters, prepared the 2001 tax returns for Fund II (whose name had been changed to Carroll Capitol), including a Form K-1 (the "K-1") that Grant Thornton transmitted to Mr. Carroll.  The K-1 that Grant Thornton prepared showed a substantial long-term capital loss based on the Asian NPL Strategy and the conclusion that KDB's basis in the loans it had contributed to Fund I had carried over to Mr. Carroll.

113.    In preparing the K-1, Grant Thornton had a duty to advise the Carrolls if Grant Thornton considered the tax treatment reflected on the K-1, in the Sidley and LeBoeuf Opinion Letters,  including the December 2001 LeBoeuf Opinion letter addressed to Chenery, or recommended by the other Promoters to be inappropriate, illegal, invalid or risky.  Grant Thornton had a duty to advise Plaintiffs if it thought that they should not prevail if the tax treatment reflected on the K-1 or Fund

II's tax returns were challenged by the IRS.

114.    Grant Thornton never so advised Plaintiffs.

115.    Grant Thornton's K-1 implicitly adopted and incorporated each of the representations in the Sidley Opinion and the LeBoeuf Opinion set forth in Paragraphs 45, 49, 51 through 53, 59, 61 through 64, 66, 67, 70 through 72, 74, 81, 98, 102, 103, 105, and 108 *supra.*

116.    Grant Thornton's K-1 failed to disclose any of the facts concealed by each of the material omissions set forth in Paragraphs 57, 88, 107, and 109 *supra.*

117.    Grant Thornton, and all of the Promoters, knew or should have known, that Plaintiffs would reasonably rely on the K-1 in filing their 2001 federal and New Jersey tax returns.

118.    In reasonable reliance on the representations made and advice given by myCFO, myCFO Advisor, myCFO Broker, Nealy, Dee, Chenery, Hahn, LeBoeuf, Sidley, Ruble, Taylor and Grant Thornton, and without knowledge of the facts they had concealed, on or about July 19, 2002, Mr. Carroll paid the remainder of his subscription fee, $1,045,242.

119.    On or around August 29, 2002, before the Carrolls filed their 2001 tax returns, Taylor spoke by telephone with one of their Crestone advisers, who asked Taylor if he and his firm would issue a "should level opinion letter" if the Asian NPL Strategy transactions had closed on that date.  Taylor assured Crestone that he and

LeBoeuf would and that "no events had occurred that would make them decide otherwise."

120.    In or about November 2001, the Carrolls had retained Brichke to provide tax planning services, to provide an independent and objective assessment of the tax risks associated with participation in the Asian NPL Strategy, to provide independent and objective advice on the proper tax treatment, for both federal and New Jersey tax purposes, of the Carrolls' participation in that strategy, and to prepare the Carrolls' personal 2001 and 2002 federal and state tax returns.

121.    Sometime in early 2002, Brichke became affiliated with Graf Repetti, which agreed to, and did, provide the services Brichke had been retained to provide.

122.    Brichke and Graf Repetti assessed and reviewed the Asian NPL Strategy and its proper tax treatment for both federal and state tax purposes.

123.    Brichke and Graf Repetti had a duty to advise the Carrolls if they considered the tax treatment reflected on the Grant Thornton K-1 or recommended by the Promoters to be inappropriate, illegal, invalid or risky.  Brichke and Graf Repetti had a duty to advise the Carrolls if they thought the Carrolls should not prevail if that tax treatment were challenged by the IRS or the State of New Jersey.

124.    Brichke and Graf Repetti never so advised the Carrolls, Brichke and Graf Repetti never disagreed with or challenged the advice provided by the Promoters.

125.    Brichke and Graf Repetti never advised the Carrolls that they could not claim a loss as reported on the K-1 prepared by Grant Thornton on the Carrolls' 2001 personal federal and state tax returns.

126.    In or about October 2002, Brichke and Graf Repetti prepared the Carrolls 2001 federal and state tax returns, which were signed by Graf Repetti as tax preparer.

127.    Those tax returns reflected both the losses on the K-1 prepared by Grant Thornton and the tax treatment described in the Sidley Opinion, the LeBoeuf Opinion and the December 2001 opinion letter LeBoeuf had addressed to Chenery and in the oral advice Taylor and LeBouef had provided.

128.    Neither Brichke nor Graf Repetti advised the Carrolls of any concerns or risks associated with the treatment of the Asian NPL Strategy as reflected on the returns prepared by Brichke and Graf Repetti.

129.    In reasonable reliance upon the advice of the Promoters, Brichke, and Graf Repetti, the Sidley Opinion, the LeBoeuf Opinion, the December 2001 Opinion letter LeBoeuf had addressed to Chenery, and the Grant Thornton K-1, on or about October 15, 2002, the Carrolls signed and filed their 2001 federal and New Jersey tax returns as prepared by Grant Thornton, Brichke, and Graf Repetti.

130.    Brichke and Graf Repetti improperly prepared the Carrolls' 2001 federal and New Jersey tax returns.

39

131.    As Brichke and Graf Repetti knew, or should have known, in fact, neither the IRS nor New Jersey would  accept the tax treatment reflected in the Sidley Opinion, the LeBoeuf Opinion, the December 2001 Opinion letter LeBoeuf had addressed to Chenery, the Grant Thornton K-1, and the advice of the Defendants.

132.    Moreover, irrespective of the legitimacy of the Defendants' advice regarding the tax treatment of the Asian NPL Strategy, New Jersey law did not allow the tax treatment contained on the Carrolls' 2001 New Jersey return, as prepared by Brichke and Graf Repetti and as originally filed, because those returns offset gains and losses of different types of entities, which New Jersey law does not permit.

133.    On or about February 3, 2003, the State of New Jersey commenced an audit of the Carrolls' 2001 state tax return.  As a result of this audit, the Carrolls were required to pay and have paid (a) $1,927,005 in additional New Jersey taxes and (b) $133,926.85 in interest thereon.

134.    In or around the end of October 2003, Mr. Carroll first became aware that the IRS was investigating Chenery's Asian NPL Strategy and other tax strategies it had sold.  Mrs. Carroll became aware of this investigation at a later date.

135.    In November 2003, Mr. Carroll first became aware of news reports that Sidley and Ruble were being investigated concerning their roles in promoting tax shelters deemed potentially abusive by the IRS, and, indeed, that on or about November 20, 2003, Ruble had pleaded the Fifth Amendment and refused to testify on grounds

that he might incriminate himself when subpoenaed before the Permanent Subcommittee on Investigations of the United States Senate Governmental Affairs Committee.  Mrs. Carroll became aware of this investigation at a later date.

136.   The reports concerning governmental investigations of Sidley and Ruble were the first time the Carrolls were aware of any possibility that any of the Defendants might have acted as promoters of potentially abusive tax shelters.

137.   These November 2003 reports were the first time that the Carrolls became aware it was possible that the IRS likely would challenge the Asian NPL Strategy as a listed transaction or abusive tax shelter and might assess additional taxes, penalties and interest against the Carrolls.

138.   The Carrolls or their representatives had numerous communications with the Promoters in 2003 and 2004 in which none of the Promoters disclosed any of the material facts previously concealed.   These communications included, but are not limited to, the following:

a.   Letters from Chenery to Mr. Carroll dated February 26, 2003, May 12, 2003, July 18, 2003, October 10, 2003, October 24, 2003, November 13, 2003, December 8, 2003, February 13, 2004, and May 6, 2004;

b.   Telephone call with Bill Tsai, Larry Austin, Roy Hahn and others from Chenery with participants in the Asian NPL Strategy on March 7, 2003;

c.   Telephone call with Randy Bickham of Skyline on June 20, 2003; and

d.    A letter from Sidley dated January 13, 2004.

139.    The Carrolls filed their amended 2001 federal tax returns in December 2003.

140.    The Carrolls could have amended their federal and state tax returns at an earlier date and avoided most of the interest that has been assessed against them as well as potential penalties.

141.    Indeed, the Carrolls would have completely avoided the assessment of interest and potential penalties but for the repeated assurances provided by Taylor and LeBoeuf, on their own behalf and on behalf of all the Promoters, that the Asian NPL Strategy was valid and strong. On April 12, 2002, Taylor told Mr. Carroll that Taylor had never seen a more defensible tax strategy.

142.    On August 30, 2002, in a telephone conversation with Crestone, Taylor said that he and his firm would issue a "should" level opinion if the Carrolls had completed the Asian NPL Strategy on that day.

143.    On both of those occasions (April 12 and August 30, 2002), the Carrolls had not yet filed their 2001 tax returns and, if advised properly, would have filed them without claiming any tax benefits from the Asian NPL strategy; had the Carrolls done so they would have not incurred, and might not in the future incur, any federal or state interest and potential penalties.

144.    In or about March 2004, the Carrolls paid additional federal taxes in

the amount of $6,103,573, plus $593,075 in interest thereon.

145.     To date, the Carrolls have sustained at least the following damages as a result of the Defendants' actions:

a.     The Carrolls paid Sidley at least $250,000;

b.     The Carrolls paid Chenery at least $650,000, which, on information and belief, Chenery shared with Ruble and Grant Thornton;

c.     The Carrolls paid LeBoeuf at least $80,000;

d.     The Carrolls paid myCFO at least $970,000;

e.     The Carrolls paid Brichke and Graf Repetti at least $20,000;

f.     The Carrolls invested approximately $1.5 million in Fund II;

g.     The Carrolls paid $6,103,573 to the IRS in additional federal taxes for the 2001 tax year;

h.     The Carrolls paid $593,075 to the IRS in federal interest for the 2001 tax year;

i.     The Carrolls paid $1,977,005 to the State of New Jersey for additional taxes for the 2001 tax year; and

j.     The Carrolls paid $133,927 to the State of New Jersey for interest for the 2001 tax year.

146.     The Carrolls have also paid, and will continue to pay, substantial amounts, estimated to exceed $1 million, to new tax, accounting, and legal advisors in

43

order to help extricate the Carrolls from the problems created by Defendants.

147.    In addition, because the Carrolls participated in the Asian NPL Strategy, they lost the opportunity to take advantage of other legitimate transactions that would have reduced their taxes.

148.    Moreover, the IRS has not finally accepted the Carrolls' 2001 amended tax return as a Qualified Amended Return.  As a result, it is possible that in the future the Carrolls may incur additional assessments for federal taxes, interest and penalties.

## FIRST CLAIM
### (RICO - Against All Defendants Except Brichke and Graf Repetti)

149.    Plaintiffs repeat, reallege and incorporate by reference each and every prior allegation in Paragraphs 1 through 148, inclusive, as if fully set forth herein.

150.    In addition to designing, developing and promoting the Asian NPL Strategy and other NPL Strategies throughout at least 2001, 2002, and 2003, LeBoeuf, Taylor, Chenery, Hahn, Grant Thornton, myCFO Advisor and myCFO Broker (collectively, "the Promoter Defendants") along with myCFO, Sidley, and Ruble, also entered into arrangements with each other to market other tax strategies that are, or might be, listed transactions; these other strategies include one named CARDS.

151.    In addition, beginning as early as 1996 and continuing through at least October 2003, each of the Promoter Defendants, separately and sometimes together with some, but not all, of the Promoters, participated in arrangements with

others to market other tax strategies that are, or might be, listed transactions. For example, Grant Thornton promoted a Digital Options Tax Strategy along with the Jenkens & Gilchrist law firm and some of its attorneys (collectively, "Jenkens"), Sidley, Ruble, Diversified Group Inc., and others. Sidley, Ruble and Jenkens also marketed a Digital Options Strategy known as COBRA along with Ernst & Young and Deutsche Bank. Sidley and Ruble marketed tax strategies known as BLIPS, FLIPS, and OPIS with KPMG. Chenery marketed the CARDS tax strategy with LeBoeuf, Taylor, Sidley, Ruble, and the myCFO entities. Chenery, Sidley and Ruble marketed a tax strategy known as ZENS.

151.   To carry out these various arrangements, the Promoter Defendants formed associations-in-fact, which are RICO enterprises, among themselves and with others.

153.   One RICO enterprise, the NPL Enterprise, consisted of the Promoter Defendants and all other persons or entities that participated in the development, sale and marketing of NPL Strategies, including the Asian NPL Strategy, at least throughout the calendar years 2001, 2002 and 2003.

154.   The other RICO enterprise, the Tax Shelter Enterprise, consisted of the Promoter Defendants and all other persons or entities that, at least from 1997 through 2003, participated in the development, sale and marketing of other tax strategies that are, or might be, listed transactions, including the Asian NPL Strategy,

CARDS, BOSS, Son-of-BOSS, COBRA, the Digital Options Strategy, BLIPS, FLIPS, ZENS, MIDCO, and others.

155.   Both the NPL Enterprise and the Tax Shelter Enterprise, constitute an ongoing organization, with an ascertainable structure and purpose beyond the predicate acts and the conspiracy to commit such acts, by which the Promoter Defendants function as a continuing unit comprised of said Defendants and others.  The members of these two Enterprises have a common or shared purpose, the obtaining of fees, cross-marketing and the referral of clients.

156.   Both the NPL Enterprise and the Tax Shelter Enterprise are engaged in and have engaged in, and their activities affect and have affected, interstate commerce, including the provision of legal, accounting, tax, and financial services across state lines.

157.   Each of the Promoter Defendants participated in the operation or management of these two Enterprises and had discretionary authority in carrying out the instructions of the other members of the Enterprises.  The Promoter Defendants made and/or authorized, the misrepresentations and omissions alleged in this Complaint; prepared engagement letters, opinion letters, other letters and documents containing information and advice about the tax strategy being promoted by the Enterprises to the Plaintiffs and others; and formed and/or operated the entities created to carry out the tax strategies or otherwise implemented the transactions underlying

46

those strategies.

158.    On information and belief, the Promoter Defendants participated in a large number of acts that had the same or similar purpose: promoting tax strategies that those Defendants knew, or should have known, would be challenged by the IRS and inducing thousands of clients to participate in those schemes by making false representations and concealing material facts.   The acts committed by the Promoter Defendants and those acting in concert with them include the following:

a.    LeBoeuf and Taylor, along with Sidley, Ruble, Chenery, Hahn and the myCFO entities, promoted a scheme known as CARDS during the period from 1999 through 2002.  This strategy was sold to at least 12 persons;

b.     Between at least 1997 and 2000, Grant Thornton, along with Sidley  Ruble, and other law firms, accountants and financial institutions not sued here, promoted the COBRA tax strategy and other Digital Options Strategies, which the IRS has ruled are listed transactions, to at least 40 clients;

c.    During that time frame, Sidley and Ruble issued more than 600 opinion letters involving at least 13 different tax strategies, earning more than $30 million in fees;  Chenery participated in at least 14 tax strategies under investigation by the IRS as potential listed transactions;  Deutsche Bank marketed the COBRA and BLIPS tax strategies to more than 90 persons and earned hundreds of millions of dollars in fees;

d.    Jenkens issued more than 600 opinion letters and, according to newspaper reports, earned over $260 million in fees from work on tax strategies between 1999 and 2003; and

e.    The Promoter Defendants, along with others, promoted the Asian NPL Strategy to the Carrolls beginning in 2001 and through 2004, the Promoter Defendants continued to provide advice to, or conceal facts from, the Carrolls regarding the strategy, the tax implications of the Asian NPL Strategy, IRS audits, and IRS subpoenas sent to some of the Promoter Defendants.  In these communications, the Promoters continued to conceal material facts from the Carrolls.

159.    The full scope of the actions taken to operate the two Enterprises are not known since the Promoter Defendants and the other members of the Enterprises have taken steps to cloak their involvement in the attorney-client privilege, the accountant-taxpayer privilege and other confidential arrangements.  However, some of the other parties injured by the activities of the two Enterprises include:  A.P. Thorpe III, A.P. Thorpe IV, Annie Gray, and Thorpe Dixon, who sued Sidley and others in the Eastern District of North Carolina in late 2002 or early 2003 based on a FLIPS transaction;  Theodore Swartz, who sued Sidley and Deutsche Bank in the Western District of Washington in June 2003 based on a BLIPS transaction; Henry Camferdam, Jeffrey Adams, Jay Michener and Carol Trigilio, who sued Sidley, Jenkens, Ernst &

Young, and Deutsche Bank in the Southern District of New York in 2003 based on a COBRA transaction; Thomas Denney, R. Thomas Wicks, Norman Kirisiti, Kathryn M. Kiristi, Donald DeStefano and Patricia DeStefano, who sued Jenkens, Sidley, BDO Seidman and others in the same court in 2003, also based on a COBRA strategy and other transactions; Joseph Stechler and Gail Stechler, who sued Sidley, Ruble, Grant Thornton and others in this court in 2004 based on a Digital Options Strategy; Michael Ling, Charles McDonald, Richard Sweret, Philip Taurisano and Barbara Taurisano, who sued Deutsche Bank and others in this court in 2004 based on a Digital Options Strategy; and Reese Jones, who sued Chenery, LeBoeuf, the myCFO entities and Deutsche Bank in 2004 in California based on a CARDS transaction.

160.    The Promoter Defendants carried out their scheme to defraud by causing the Carrolls and hundreds of other taxpayers/clients to participate in the NPL Strategies, including the Asian NPL Strategy, as well as other tax strategies, by making statements that the Promoters knew to be false and failing to disclose material facts, which statements and omissions Plaintiffs and other taxpayers/clients reasonably relied upon in participating in the tax strategies and in filing their federal tax returns as prepared by the Promoter Defendants or others in accordance with the advice provided by the Promoter Defendants and those acting in concert with them.  The Promoter Defendants caused and intended to cause the Carrolls and other taxpayers/clients to pay the Promoter Defendants and those acting in concert with them huge sums of

money.

161.    The Promoter Defendants, and those acting in concert with them, conducted, or participated in the conduct of, the NPL Enterprise's affairs and the Tax Shelter Enterprise's affairs through a pattern of racketeering activity consisting of, *inter alia*, more than two acts of mail fraud and wire fraud (in violation of 18 U.S.C. §§ 1341 and 1343, respectively).  As part of this pattern, continuing over the course of years, by using the mails, private interstate carriers and interstate wire communications, including the Internet, the said Promoter Defendants, through these two Enterprises, sold these tax schemes to hundreds, if not thousands, of clients, including the Carrolls. In particular, without limitation, in violation of 18 U.S.C. §§ 1341 and 1343, the Promoters employed the Postal Service and/or private or commercial interstate carriers and/or interstate wire communications to send their retainer letters, invoices, opinion letters, tax advice, and financial advice to the Carrolls and over 600 other clients, and to receive from Plaintiffs and many other clients payments of Defendants' invoices, all as set forth above.

162.    Each of the Promoters committed the acts attributed to him or it intentionally and willfully or with actual knowledge of the illegal activities.  Each of the Promoters acted with the specific intent to participate in the overall RICO Enterprises.

163.    Each Promoter's conduct as set forth herein was in concert with each of the other Promoter's conduct, and planned and pre-arranged with and known

by each of the other Promoters pursuant to the Promoters' common scheme to sell tax strategies for millions of dollars.

164.   Each of the Promoter Defendants was aware of the general nature of the conspiracy, agreements, arrangements and scheme  set forth in this Complaint and agreed to facilitate them.

165.   The Promoter Defendants' conduct of the Enterprises and their pattern of racketeering activity commenced in 1997 or 1998, well before when they and other members of the Tax Shelter Enterprise first contacted the Carrolls in 2001 to solicit their participation in the Asian NPL Strategy, continued  beyond the end of 2003 when the Promoter Defendants continued to make misrepresentations to the Carrolls and conceal facts from them, and continues through the present, when the Promoter Defendants continue to communicate with their clients, using interstate mail and wire facilities, but not to reveal and, in fact, hide the full extent of said Promoter Defendants' malpractice and racketeering conduct, and continue to promote tax shelters.

166.   The Promoter Defendants' conduct of the NPL Enterprise and the Tax Shelter Enterprise and their pattern of racketeering activity were not limited to the acts involving Plaintiffs but included acts directed to many other clients as well, including but not limited to those identified in Paragraph  159 *supra*. On information and belief, the Promoter Defendants have continued to engage in racketeering activity designed to promote illegal tax strategies, and to disguise and hide the illegal nature of

51

their prior acts, posing the threat of continuing criminal activity.

167.    On information and belief, the Promoter Defendants have combined in two Enterprises to sell other illegal tax shelters, activity that spans a longer period of time than the Asian NPL Strategy, and that poses the threat of continuing criminal activity.

168.    The Promoter Defendants' conduct violated 18 U.S.C. §§ 1962(c) and 1962(d).

169.    As a result of said Defendants' conduct set forth herein, Plaintiffs have suffered injury in their business and property in that (a) they have paid the Promoters in excess of  $1.97 million, (b) they have paid or may incur tax penalties and interest in an amount exceeding $727,000, (c) they have had to make tax payments in an amount exceeding $8 million they were promised they would not have to make, (d) they have paid and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation in excess of $1 million,  and (e) they have foregone legitimate tax savings opportunities and tax deductions.

170.    The Carrolls and the public are threatened with future loss and injury and/or irreparable harm due to the Promoter Defendants' violation of the RICO laws.

171.    Plaintiffs seek an injunction enjoining the Promoter Defendants from:

a.     Engaging in the same types of conduct or endeavor alleged herein;

b.     Devising, offering, and soliciting clients for, or promoting, tax strategies that are, or are likely to become, listed transactions;

c.     Preparing tax returns involving tax strategies that are, or are likely to become, listed transactions;

d.     Providing legal advice regarding tax strategies that are, or are likely to become, listed transactions;

e.     Soliciting clients for, referring clients to, or engaging in marketing or business development programs, with each other;

f.     Sharing fees or income with each other;

g.     Committing any acts of mail fraud or wire fraud; and

h.     Violating the RICO laws.

172.   Plaintiffs also seek an injunction requiring the Promoter Defendants to:

a.     Divest themselves of any interest, direct or indirect, in the two Enterprises; and

b.     Dissolve the two Enterprises.

173.   As a proximate cause of the foregoing, Plaintiffs have been injured in an amount to be proved but believed to be at least $12 million, and should be awarded treble damages of at least $36 million, plus attorneys' fees and costs.

## SECOND CLAIM
## (LEGAL MALPRACTICE -Against LeBoeuf and Taylor)

174.   Plaintiffs repeat, reallege and incorporate by reference each and every prior allegation in Paragraphs 1 through 180, inclusive, as if fully set forth herein.

175.   LeBoeuf and Taylor acted as Plaintiffs' tax advisors and attorneys. Each of them owed Plaintiffs a duty to represent them with such reasonable skill, care, and diligence as members of the legal profession commonly possess and exercise in similar situations.

176.   LeBoeuf had a duty to put in place and implement adequate controls to protect their clients from the intentional fraud and negligent misconduct of Taylor, but failed to adopt or implement such controls.

177.   Throughout their engagements, LeBoeuf and Taylor represented that they had a high level of experience in providing tax advice and that they were competent to perform all of the necessary services for Plaintiffs in compliance with the applicable professional standards and with the reasonable skill, care, and diligence that members of the legal profession commonly possess and exercise in similar situations.

178.   At all times, Plaintiffs reasonably relied on LeBoeuf and Taylor to perform all of their professional obligations with the requisite skill, expertise, and integrity that one would expect from such prominent law firms and such prominent tax attorneys.

179.   At all relevant times, LeBoeuf and Taylor owed a duty to Plaintiffs

to exercise due care while performing services and functioning as Plaintiffs' tax advisors and attorneys.

180.   LeBoeuf and Taylor breached their duties to Plaintiffs by the conduct alleged above in Paragraphs 1 through 180 *supra*, including but not limited to, the rendering of the LeBoeuf Opinion, the December 2001 Opinion by LeBoeuf addressed to Chenery, and the "plain English" letters, the oral advice of Taylor described above, and the failure to advise Plaintiffs of changed circumstances before they filed their 2001 tax returns. The services LeBoeuf and Taylor provided to Plaintiffs fell below the standard of care exercised by attorneys engaged to provide tax advice and similar services.

181.   The services LeBoeuf and Taylor provided to Plaintiffs were deficient, inadequate and not competent, and were not subject to appropriate and adequate supervisory controls. These Defendants' actions fell below the standard of care exercised by lawyers engaged to provide tax advice and similar services.

182.   Plaintiffs fully performed their obligations to LeBoeuf and Taylor under their agreements.

183.   As a direct and proximate result of the foregoing, Plaintiffs have suffered and will continue to suffer substantial monetary damages, including but not limited to, the payments to the Promoters in excess of $1.97 million; the payment of additional federal and New Jersey taxes and interest in the amount of at least $8.8

million; the investment in the Asian NPL Strategy; the payment of professional fees to new attorneys and accountants to rectify the problems caused by LeBoeuf and Taylor of at least $1 million; and the loss of legitimate tax saving opportunities.

184.   The conduct of Taylor and LeBoeuf was part of a pattern directed at the public generally in that (1) these Defendants acted, with the other Promoter Defendants and others, to sell tax strategies that might be, or were, listed transactions to wealthy taxpayers generally and (2) their conduct affected state and federal tax revenues and the commonweal.   Accordingly, Plaintiffs are entitled to punitive damages to vindicate public rights.

185.   At all relevant times, LeBoeuf, and Taylor acted with a high degree of moral turpitude, with such recklessness, wanton negligence, wanton dishonesty and actual malice, and with an intent to benefit themselves in violation of the public trust given to lawyers and contrary to the public welfare, thereby entitling Plaintiffs to an award of punitive damages against said Defendants, and each of them, in order to punish said Defendants and deter similar misconduct by them and others in the future.

### THIRD CLAIM
### (ACCOUNTING MALPRACTICE - Against Grant Thornton)

186.   Plaintiffs repeat, reallege and incorporate by reference each and every prior allegation in Paragraphs 1 through 180, inclusive, as if fully set forth herein.

187.   Grant Thornton acted as Plaintiffs' tax advisor, tax preparer, and accountant.   Grant Thornton owed Plaintiffs a duty to represent them with such

reasonable skill, care, and diligence as members of the accounting profession commonly possess and exercise in similar situations.

188.   Throughout Grant Thornton's engagement, Grant Thornton represented that it had a high level of experience in providing tax advice and preparing tax returns and that it was competent to perform all of the necessary services for Plaintiffs in compliance with the applicable professional standards and with the reasonable skill, care, and diligence that members of the accounting profession commonly possess and exercise in similar situations.

189.   At all times, Plaintiffs reasonably relied on Grant Thornton to perform all of its professional obligations with the requisite skill, expertise, and integrity that one would expect from such prominent certified public accountants.

190.   At all relevant times, Grant Thornton owed a duty to Plaintiffs to exercise due care while performing services and functioning as Plaintiffs' tax advisor, tax preparer, and accountant.

191.   Grant Thornton breached its duties to Plaintiffs by the conduct alleged in Paragraphs 1-180 *supra*, including but not limited to the preparation of the Carroll Capital 2001 tax return and accompanying Form K-1.  The services that Grant Thornton provided to Plaintiffs fell below the standard of care exercised by accountants engaged to provide tax advice, prepare tax returns, and similar services.

192.   Plaintiffs fully performed their obligations to Grant Thornton

under their agreement.

193.    As a direct and proximate result of the foregoing, Plaintiffs have suffered and will continue to suffer substantial monetary damages, including but not limited to, the payments to the Promoters in excess of $1.97 million; the payment of federal and state taxes and interest in the amount of at least $8.8 million; the fees paid to Grant Thornton by Chenery or Fund II, the cost which fees were ultimately borne by the Carrolls; the investment in the Asian NPL Strategy; the payment of professional fees to new attorneys and accountants to rectify the problems caused by Defendants, including Grant Thornton, of at least $1 million, as set forth above; and the loss of legitimate tax saving opportunities.

**FOURTH CLAIM**
**(ACCOUNTING MALPRACTICE – Against Brichke and Graf Repetti)**

194.    Plaintiffs repeat, reallege and incorporate by reference each and every prior allegation in Paragraphs 1 through 148, inclusive, as if fully set forth herein.

195.    Brichke and Graf Repetti acted as Plaintiffs' tax advisors, tax preparers, and accountants.   Brichke and Graf Repetti owed Plaintiffs a duty to represent them with such reasonable skill, care, and diligence as members of the accounting profession commonly possess and exercise in similar situations.

196.    Throughout Brichke's engagement, Brichke represented that he had a high level of experience in providing tax advice and preparing tax returns and that he was competent to perform all of the necessary services for Plaintiffs in compliance with

58

the applicable professional standards and with the reasonable skill, care, and diligence that members of the accounting profession commonly possess and exercise in similar situations.

197.   Throughout Graf Repetti's engagement, Graf Repetti represented that it had a high level of experience in providing tax advice and preparing tax returns and that it was competent to perform all of the necessary services for Plaintiffs in compliance with the applicable professional standards and with the reasonable skill, care, and diligence that members of the accounting profession commonly possess and exercise in similar situations.

198.   At all times, Plaintiffs reasonably relied on Brichke and Graf Repetti to perform all of their professional obligations with the requisite skill, expertise, and integrity that one would expect from such accountants.

199.   At all relevant times, Brichke and Graf Repetti owed a duty to Plaintiffs to exercise due care while performing services and functioning as Plaintiffs' tax advisors, tax preparers, and accountants.

200.   Brichke and Graf Repetti breached their duties to Plaintiffs by the conduct alleged in Paragraphs 1-148 *supra*, including, but not limited to, the improper preparation of the Carrolls' federal and New Jersey 2001 tax returns.  The services that Brichke and Graf Repetti provided to Plaintiffs fell below the standard of care exercised by accountants engaged to provide tax advice, tax preparation, and similar services.

59

201.    Plaintiffs fully performed their obligations to Brichke and Graf Repetti under their agreements.

202.    As a direct and proximate result of the foregoing, Plaintiffs have suffered and will continue to suffer substantial monetary damages, including but not limited to, the payment to the Promoters in excess of $1.97 million; the payment of additional federal and New Jersey taxes and interest in the amount of at least $8.8 million; the investment in the Asian NPL Strategy; the payment of professional fees to new attorneys and accountants to rectify the problems caused by Defendants, including Brichke and Graf Repetti, of at least $1 million; and the loss of legitimate tax saving opportunities.

### FIFTH CLAIM
### (FRAUD - Against All Defendants Except Brichke and Graf Repetti)

203.    Plaintiffs repeat, reallege and incorporate by reference each and every prior allegation in Paragraphs 1 through 180, inclusive, as if fully set forth herein.

204.    Each of the Promoter Defendants – LeBoeuf, Taylor, Chenery, Hahn, Grant Thornton, and HarrismyCFO – is liable for the misrepresentations and omissions made by each of the other Promoter Defendants, Sidley, Ruble, myCFO, Nealy and Dee because the Promoters authorized each other to make those representations and omissions on each other's behalf; and because the Promoters agreed that any one of them communicating or meeting with potential and/or actual participants in a tax strategy – including with Mr. Carroll – could act as agent of all of

the other Promoters and make representations and omissions regarding the role, work, opinions, and views of the other Promoters.  The Promoter Defendants also are liable as co-conspirators.

205.    As Plaintiffs' attorneys, LeBoeuf and Taylor had a duty not to make willful, reckless or knowing material misrepresentations and not to  willfully, recklessly or knowingly conceal material facts.  In violation of that duty, LeBoeuf and Taylor willfully, recklessly or knowingly made numerous material misrepresentations and concealed or failed to disclose numerous material facts as set forth above, prior to their retention or engagement by Plaintiffs.

206.    Chenery, Hahn, myCFO Advisor, and myCFO Broker[3] acted as Plaintiffs' investment, tax, and financial advisor and manager.  As a result of that relationship, Chenery, Hahn, myCFO Advisor, and myCFO Broker had a duty not to make willful, reckless or knowing material misrepresentations and not to willfully, recklessly or knowingly conceal material facts.  In violation of that duty, Chenery, Hahn, myCFO Advisor, and myCFO Broker willfully, recklessly or knowingly made numerous material misrepresentations and concealed or failed to disclose numerous material facts as set forth above

207.    Grant Thornton acted as Plaintiff's accountant and tax preparer.  As

---

[3]      myCFO Advisor and myCFO Broker are now HarrismyCFO.

a result of that relationship, Grant Thornton had a duty not to make willful, reckless or knowing material misrepresentations and not to willfully, recklessly or knowingly conceal material facts.  In violation of that duty, Grant Thornton willfully, recklessly or knowingly made numerous material misrepresentations and concealed or failed to disclose numerous material facts as set forth above.

208.    In order to induce Plaintiffs to retain them and pay them millions of dollars in fees, LeBoeuf, Taylor, Chenery, Hahn, Grant Thornton, myCFO Advisor, and myCFO Broker, as well as their co-Promoters Sidley, Ruble, myCFO, Nealy, and Dee, willfully, recklessly or knowingly made numerous material false affirmative representations and willfully, recklessly or knowingly concealed or failed to disclose material facts to the Plaintiffs, as set forth above.

209.    The above material affirmative misrepresentations and omissions made by or on behalf of each said Promoters were false, misleading, and material when made or omitted, and said Promoter Defendants knew these representations and omissions to be false, misleading, and material when made or omitted, with the intention that the Plaintiffs would rely upon them in deciding to retain said Promoter Defendants, in entering into the Asian NPL Strategy, and in paying said Defendants and co-Promoters myCFO, Sidley and Ruble  millions of dollars in fees.

210.    But for the intentional misrepresentations and material omissions of LeBoeuf, Taylor, Chenery, Hahn, Grant Thornton, myCFO Advisor, and myCFO

Broker, and their co-Promoters, described above, Plaintiffs would never have hired LeBoeuf, Taylor, Sidley, Ruble, Chenery, Hahn, myCFO, Grant Thornton, myCFO Advisor, myCFO Broker, Brichke and Graf Repetti for advice on the Asian NPL Strategy, invested and engaged in the Asian NPL Strategy, or filed federal and state tax returns prepared in accordance with the advice of the Promoter Defendants. In reasonable reliance on said Defendants' knowing and intentional material misrepresentations and omissions, Plaintiffs paid the Promoters, Brichke and Graf Repetti, in excess of $1.97 million, invested in the Asian NPL Strategy, and filed tax returns reflecting said Defendants' advice.

211.    Plaintiffs reasonably relied on the representations and incomplete facts disclosed by LeBoeuf, Taylor, Chenery, Hahn, Grant Thornton, myCFO Advisor, and myCFO Broker and their co-Promoters.  These Defendants held themselves out as experienced, competent and excellent tax specialists, lawyers, accountants, and providers of financial services, in their engagement letters, on their websites and in their marketing literature and elsewhere.

212.    As a proximate result of said Defendants' fraud, Plaintiffs have been injured in an amount to be proved but believed to be at least $12 million.

213.    At all relevant times, LeBoeuf, Taylor, Hahn, Chenery, Grant Thornton, myCFO Advisor, and myCFO Broker, acted willfully and recklessly, with actual malice, with such recklessness or wanton negligence as to evince a conscious

disregard of the rights of Plaintiffs, and with an intent to benefit themselves in violation of the public trust given to lawyers, tax professionals, and financial advisers and contrary to the public welfare in that they knew that they were subverting the federal and New Jersey tax systems, thereby entitling Plaintiffs to an award of punitive damages against said Defendants, and each of them, in order to punish said Defendants and deter similar misconduct by them and others in the future.

**SIXTH CLAIM**
**(NEGLIGENT MISREPRESENTATION - Against All Defendants Except Brichke and Graf Repetti)**

214.    Plaintiffs repeat, reallege and incorporate by reference each and every prior allegation in Paragraphs 1 through 180, inclusive, as if fully set forth herein.

215.    Each of the Promoter Defendants – LeBoeuf, Taylor, Chenery, Hahn, Grant Thornton, and HarrismyCFO – is liable for the misrepresentations and omissions made by each of the other Promoter Defendants, Sidley, Ruble, myCFO, Nealy, and Dee because the Promoters authorized each other to make those representations and omissions on each other's behalf; and because the Promoters agreed that any one of them communicating or meeting with potential and/or actual participants in a tax strategy – including with Mr. Carroll – could act as agent of all of the other Promoters and make representations and omissions regarding the role, work, opinions, and views of the other Promoters.   The Promoters also are liable as co-conspirators.

64

216.   As Plaintiffs' attorneys, LeBoeuf and Taylor had a duty not to make negligent material misrepresentations and not to negligently conceal material facts.  In violation of that duty, LeBoeuf and Taylor negligently made numerous material misrepresentations and concealed or failed to disclose numerous material facts as set forth above, prior to their retention or engagement by Plaintiffs.

217.   Chenery, Hahn, myCFO Advisor, and myCFO Broker[4], acted as Plaintiffs' investment, tax, and financial advisors and managers.  As a result of that relationship, Chenery, Hahn, myCFO Advisor, and myCFO Broker had a duty not to make negligent misrepresentations and not to negligently conceal material facts.  In violation of that duty, Chenery, Hahn, myCFO Advisor, and myCFO Broker negligently made numerous material misrepresentations and concealed or failed to disclose material facts as set forth above.

218.   Grant Thornton acted as Plaintiffs' accountant and tax preparer.  As a result of that relationship, Grant Thornton had a duty not to make negligent material misrepresentations and not to negligently conceal material facts.  In violation of that duty, Grant Thornton negligently made numerous material misrepresentations and concealed or failed to disclose numerous material facts as set forth above.

219.   In order to induce Plaintiffs to retain them and pay them millions

---

[4]      myCFO Advisor and myCFO Broker are now HarrismyCFO.

of dollars in fees, LeBoeuf, Taylor, Chenery, Hahn, Grant Thornton, myCFO Advisor, and myCFO Broker, as well as their co-Promoters Sidley, Ruble, myCFO, Nealy and Dee, negligently made numerous material false affirmative representations and negligently concealed or failed to disclose material facts to the Plaintiffs, as set forth above.

220.    The above material affirmative misrepresentations and omissions made by or on behalf of each said Promoter Defendants were false, misleading, and material when made or omitted, and said Promoter Defendants should have known these representations and omissions were false, misleading, and material when made or omitted, with the intention that the Plaintiffs would rely upon them in deciding to retain said Promoter Defendants, in entering into the Asian NPL Strategy, and in paying said Promoter Defendants and co-Promoters Sidley, Ruble and myCFO millions of dollars in fees.

221.    But for the negligent misrepresentations and material omissions of LeBoeuf, Taylor, Chenery, Hahn, Grant Thornton, myCFO Advisor, myCFO Broker, and their co-Promoters myCFO, Nealy and Dee, described above, Plaintiffs would never have hired LeBoeuf, Taylor, Sidley, Ruble, Chenery, Hahn, Grant Thornton, myCFO, myCFO Advisor, myCFO Broker, Brichke and Graf Repetti for advice on the Asian NPL Strategy, invested and engaged in the Asian NPL Strategy, or filed federal and state tax returns prepared in accordance with the advice of the Promoter

66

Defendants. In reasonable reliance on said Defendants' negligent material misrepresentations and omissions, Plaintiffs paid the Promoters, Brichke and Graf Repetti, in excess of $1.97 million, invested in the Asian NPL Strategy and filed tax returns reflecting said Defendants' advice.

222.   Plaintiffs reasonably relied on the representations and incomplete facts disclosed by LeBoeuf, Taylor, Chenery, Hahn, Grant Thornton, myCFO Advisor, myCFO Broker, and their co-Promoters.  These Defendants held themselves out as experienced, competent and excellent tax specialists, lawyers, accountants, and providers of financial services, in their engagement letters, on their websites and in their marketing literature and elsewhere.

223.  As a proximate result of said Defendants' negligent misrepresentations, Plaintiffs have been injured in an amount to be proved but believed to be at least $12 million.

### SEVENTH CLAIM
### (FORFEITURE OF FEES, RESCISSION OF INVALID FEE AGREEMENTS, RESTITUTION, DISGORGEMENT OR RECOUPMENT OF UNETHICAL, EXCESSIVE, ILLEGAL AND UNREASONABLE FEES, AND UNJUST ENRICHMENT - Against All Defendants Except Grant Thornton, Brichke and Graf Repetti)

224.   Plaintiffs repeat, reallege and incorporate by reference each and every prior allegation in Paragraphs 1 through 180, inclusive, as if fully set forth herein.

225.   Upon information and belief, the Promoters entered into an agreement whereby they would solicit each other's clients and promote tax strategies

and shelters.  Such solicitations by attorneys violate Rule 5.4(c) of the New Jersey Rules of Professional Conduct, and Rule 1-320(B) of the California Rules of Professional Conduct.  LeBoeuf and Taylor, through Chenery and the myCFO entities, solicited professional employment from Plaintiffs in violation of the foregoing rules.

226.   By agreeing in advance to provide legal advice and opinions to clients the myCFO entities and Chenery would solicit, and by allowing those firms to use LeBoeuf's name and Taylor's name in soliciting clients and to promise that LeBoeuf and Taylor would endorse the plan described by those firms, LeBoeuf and Taylor allowed Chenery and the myCFO entities to receive substantial fees, thereby compensating and giving them something of value for recommending LeBoeuf and Taylor's services in violation of Rule 1-320(B) of the California Rules of Professional Conduct, as well as Rule 5.4(c) of the New Jersey Rules of Professional Conduct.

227.   These Defendants' arrangements described here constituted a partnership and association of lawyers and nonlawyers that included the practice of law for a profit and aided nonlawyers in the unauthorized practice of law.  The arrangement violated Rules 5.5(a)(2) of the New Jersey Rules of Professional Conduct, and Rule 1-380(A) of the California Rules of Professional Conduct.

228.   LeBoeuf and Taylor engaged in clear and serious violations of the duties they owed to Plaintiffs.

229.   The fees collected by LeBoeuf and Taylor were excessive,

unreasonable, and in violation of the applicable ethical standards.

230.    Irrespective of the merits of the LeBoeuf Opinions, and the advice of Taylor and LeBoeuf, the fees that LeBoeuf and Taylor charged Mr. Carroll ($80,000) were unethically excessive in violation of, and invalid and unenforceable under, Rule 1.5 of the New Jersey Rules of Professional Conduct, and Rule 4-200(A) of the California Rules of Professional Conduct.  The amount of fees charged by these lawyers was not tied to or reflective of the amount of time and effort they expended in providing services to Plaintiffs.

231.    On information and belief, LeBoeuf and Taylor charged many other clients similarly high fees for the same opinions and advice, changing only the names, dates, and amounts of investments to "customize" the opinions for each client, and spent next to no time or effort in providing the opinions sent to Mr. Carroll.  In other words, LeBoeuf and Taylor provided Mr. Carroll with canned, off-the-shelf, fill-in-the-blanks opinion letters, for which charges of $80,000, were unethically excessive.

232.    In addition, because LeBoeuf and Taylor did not disclose information to Mr. Carroll that they were required to disclose, such as that they and others were promoting the Asian NPL Strategy, that they were splitting fees, that they had a significant pecuniary interest in that strategy, that there was a significant risk that their role as Promoters would vitiate or diminish the attorney-client and accountant-taxpayer privileges and the ability of Plaintiffs to rely on their opinions and advice, and

69

that their representation of Mr. Carroll violated applicable rules of professional conduct and standards of care, as set forth herein, their fee agreement with Mr. Carroll is unenforceable and invalid.

233.    Moreover, the legal services provided by LeBoeuf, and Taylor were of no value to Mr. Carroll, and the fees that LeBoeuf, and Taylor were paid for such services unjustly enriched them, at the Carrolls' expense.  Equity and good conscience demand the disgorgement of those fees.

234.    Further, the legal services provided by LeBoeuf and Taylor had no value and, as measured by quantum meruit, those lawyers would have earned and collected nothing for the services they provided.

235.    LeBoeuf and Taylor have been unjustly enriched by the collection of fees from Plaintiffs in that they benefited, at Plaintiffs' expense, by collecting fees that were excessive, unreasonable and improper.  Equity and good conscience demand the return of those fees.

236.    Accordingly, Plaintiffs are entitled to rescind the agreement to pay LeBoeuf and Taylor $80,000 and are entitled to restitution or recoupment of that amount from them, who must forfeit or disgorge those fees to Plaintiffs.

237.    Chenery never disclosed that it and the other Promoter Defendants were promoting the Asian NPL Strategy, and that the fees it would earn would be kicked back to Ruble.  Irrespective of the services Chenery provided, the fees it received

were excessive.

238.    The fees charged by Chenery were invalid and unreasonable and the Plaintiffs are entitled to rescission of their agreement to pay those fees.

239.    Chenery was unjustly enriched by its receipt of the fees paid by Plaintiffs in that Chenery benefited, at Plaintiffs' expense, by collecting fees that were excessive, unreasonable and improper.  Equity and good conscience demand the return of those fees.

240.    Accordingly, Plaintiffs are entitled to rescind the agreement to pay Chenery $650,000 and are entitled to restitution or recoupment of that amount from Chenery, who must disgorge or forfeit those fees to Plaintiffs.

241.    The myCFO entities never disclosed that they and the other Promoter Defendants were promoting the Asian NPL Strategy.  Irrespective of the services the myCOF entities provided, the fees it received were excessive.

242.    The fees paid by the Carrolls to myCFO were divided among the myCFO entities.

243.    The fees paid to the myCFO entities were invalid and unreasonable and the Plaintiffs are entitled to rescission of their agreement to pay those fees.

244.    The myCFO entities, including myCFOAdvisor and myCFOBroker, were was unjustly enriched by its receipt of the fees paid by Plaintiffs in that they benefited, at Plaintiffs' expense, by collecting fees that were excessive, unreasonable and

71

improper.  Equity and good conscience demand the return of those fees.

245.    Accordingly, Plaintiffs are entitled to rescind the agreement to pay the myCFO entities $970,000 and are entitled to restitution or recoupment of that amount from HarrismyCFO, who must disgorge or forfeit those fees to Plaintiffs.

**EIGHTH CLAIM**
**(DECLARATORY JUDGMENT - Against All Defendants)**

246.    Plaintiffs repeat, reallege and incorporate by reference each and every prior allegation in Paragraphs 1 through 180, inclusive, as if fully set forth herein.

247.    Plaintiffs request that this Court declare the rights and legal relations of Plaintiffs and Defendants.  Plaintiffs take the position that Defendants have committed violations of the RICO statute, professional malpractice, fraud, constructive fraud/negligent misrepresentation and/or have charged unethical excessive and illegal fees.  Defendants deny such claims.  Thus, a justiciable controversy has arisen over the rights and legal relations of the parties.

248.    The IRS has not audited the Carrolls' 2001 amended tax return or their 2002 return; nor has the IRS accepted their 2001 amended return as a Qualified Amended Return.  The State of New Jersey has not audited the Carrolls' 2002 return.  The IRS and New Jersey may assess additional taxes, interest, and penalties, causing the Carrolls additional damages in an amount not yet determined.

249.    The Carrolls must continue to pay tax, accounting, and legal advisors to extricate them from the problems created by Defendants' misconduct as

alleged herein.  The amount of these costs is not yet determined.

250.    Pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, Plaintiffs are entitled to a declaratory judgment that Defendants are liable to Plaintiffs for such additional damages that will be incurred in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    On the First Claim, for RICO violations, against all Defendants except Brichke and Graf Repetti, damages in an amount to be proved, but believed to be at least $12 million, trebled to at least $36 million, plus attorneys' fees and costs;

B.    On the Second Claim, for Legal Malpractice, against LeBoeuf and Taylor, damages in an amount to be proved, but believed to be at least $12 million, plus punitive damages;

C.    On the Third Claim, for Accounting Malpractice, against Grant Thornton, damages in an amount to be proved, but believed to be at least $12 million;

D.    On the Fourth Claim, for Accounting Malpractice, against Brichke and Graf Repetti, damages in an amount to be proved, but believed to be at least $12 million;

E.    On the Fifth Claim, for Fraud, against all Defendants except Brichke and Graf Repetti, damages in an amount to be proved, but believed to be at least $12 million, plus punitive damages;

F.     On the Sixth Claim, for negligent misrepresentation, against all Defendants except Brichke and Graf Repetti, damages in an amount to be proved, but believed to be at least $12 million;

G.     On the Seventh Claim, for Invalid Fee Agreements and Unethical, Excessive, Illegal, and Unreasonable Fees and Unjust Enrichment, against LeBoeuf, Taylor, Hahn, Chenery, and HarrismyCFO, forfeiture and disgorgement of their fees, in the amount of $80,000 paid to LeBoeuf and Taylor, $650,000 paid to Chenery and shared with Hahn, and $970,000 paid to the myCFO entities, now part of HarrismyCFO;

H.     On the Eighth Claim, for Declaratory Judgment, against all Defendants, a declaration that Defendants are liable to Plaintiffs for such damages that have not yet been and will be incurred in the future, including but not limited to any additional federal and New Jersey taxes, interest, and penalties that may be assessed against Plaintiffs, and for professional fees incurred to rectify Defendants' wrongdoing;

I.     Costs, expenses, reasonable attorneys' fees, and prejudgment interest to the fullest extent authorized by law; and

J.     Such other and further relief which the Court deems necessary and proper at law and in equity.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: New York, New York
        January _____, 2005

Respectfully submitted,

**FENSTERSTOCK & PARTNERS LLP**

By_____

Blair C. Fensterstock (BF 2020)
Maureen M. McGuirl (MM 4910)
Josiah Greenberg (JG 9389)
Jennifer A. White (JW 9671)

30 Wall Street, 9th Floor
New York, New York 10005
(212) 785-4100

*Attorneys for Plaintiffs*