UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
KENNETH CARROLL, et al.,

          Plaintiffs,

        -against-                            05 Civ. 0391 (LAK)

LEBOUF, LAMB, GREEN & MACRAE,
L.L.P., et al.,

          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


Appearances:

Blair C. Fensterstock
Maureen McGuirl
FENSTERSTOCK & PARTNERS LLP
*Attorneys for Plaintiffs*


Kevin J. Harrington
HARRINGTON, OCKO & MONK, LLP
*Attorneys for Defendant Graf Repetti & Co., LLP*


LEWIS A. KAPLAN, *District Judge.*

        Plaintiffs bring a variety of claims against their former lawyers, accountants, and financial advisors, alleging their misrepresentations, material omissions, and negligence caused plaintiffs to participate in an invalid investment and tax strategy and to incur substantial financial damages. Defendant Graf Repetti & Co., LLP ("GRC") moves to dismiss.

### I.      Background

The amended complaint (the "Complaint") alleges the following facts, which the Court accepts as true for the purposes of this motion.

At the center of this action is a scheme to develop and promote a tax strategy that would allow persons legally to avoid paying taxes.  Defendants Chenery Associates, Inc., Sussex Financial Enterprises, Inc., and Chenery Management, Inc. (collectively, "Chenery"), and their owner, defendant Roy E. Hahn, developed a tax shelter strategy involving non-performing loans made by banks outside the United States (the "NPL Strategies").[1]  Other contributors to the NPL Strategies included defendants Graham Taylor, R.J. Ruble, and LeBoeuf, Lamb, Greene & MacRae, L.L.P.[2]  Defendant Sidley Austin Brown & Wood LLP agreed to provide opinion letters regarding the lawfulness of the NPL Strategies.[3] Defendant Grant Thornton LLP agreed to prepare tax documents for entities established by Chenery to implement the NPL Strategies.[4]  These defendants, along with myCFO, myCFO Advisor, and myCFO Broker, worked together to promote the NPL Strategies.[5]

In October 2001, plaintiffs Kenneth and Elizabeth Carroll began to consider investing in an NPL Strategy involving distressed, non-performing loans made by Asian banks (the "Asian

---

[1]      Cpt. ¶¶ 13-18, 31, 32

[2]      *Id*. ¶¶ 33, 34.

[3]      *Id*. ¶ 36.

[4]      *Id*. ¶ 42.

[5]      *Id*. ¶¶ 44-48.

NPL Strategy").[6]  The Carrolls met with various representatives of the promoter defendants to discuss the Asian NPL Strategy and its tax-saving possibilities.[7]  Believing the tax shelter would provide significant, legitimate tax savings, and that it would pass muster with the IRS and the state of New Jersey, the Carrolls decided to participate and included their investment in the strategy on their 2001 tax returns.[8]  In order to participate, Mr. Carroll purchased Korean Development Bank's interest in a distressed loan pool, called Fund II, and later made additional investments.[9]  The promoter defendants knew or should have known that the Asian NPL Strategy would be challenged by the IRS and New Jersey, but represented that the strategy was safe and lawful.  Both the IRS and the State of New Jersey challenged the deductions taken by the Carrolls, and they subsequently paid substantial additional federal and state taxes and interest.[10]

The Complaint does not allege that GRC was involved in the initial promotion of the Asian NPL Strategy.  Instead, plaintiffs allege that they hired defendant Jay Brichke, an accountant, in November 2001

> "to provide tax planning services, to provide an independent and objective assessment of the tax risks associated with participation in the Asian NPL Strategy, to provide independent and objective advice on the proper tax treatment, for both federal and New Jersey tax purposes, of the Carrolls' participation in that strategy,

---

[6]   *Id.* ¶¶ 49-51.

[7]   *Id.* ¶¶ 51-59.

[8]   *Id.* ¶¶ 59.

[9]   *Id.* ¶¶ 80, 85, 88-91.  The Carrolls later changed Fund II's name to Carroll Capital Holdings LLC, the third plaintiff in this action.  *Id.* ¶ 101.

[10]   *Id.* ¶¶ 148, 151-156.

and to prepare the Carrolls' personal 2001 and 2002 federal and state tax returns."[11] The Complaint then alleges that Brichke became affiliated with GRC "[s]ometime in the first half of 2002" and that GRC then "agreed to, and did, provide the services Brichke had been retained to provide," including "assess[ing] and review[ing] the Asian NPL Strategy and its proper tax treatment for both federal and state tax purposes."[12]

The Carrolls provided GRC with the Fund II Form K-1 prepared by defendant Grant Thorton to use in preparing their individual tax returns.[13] GRC prepared the Carrolls' individual 2001 federal and state tax returns, but never advised plaintiffs that that tax treatment reflected in the K-1 was invalid or risky or that the Carrolls could not claim such a loss on their returns.[14] As it turned out, not only did New Jersey and the IRS both reject the tax treatment of the Asian NPL Strategy and assess additional taxes and interest against plaintiffs, but GRC erroneously offset gains and losses of different types of entities, which New Jersey does not permit.[15]

The Complaint alleges that GRC thus committed accounting malpractice and caused several kinds of harm to plaintiffs: the investment in the NPL Strategy itself, the loss of legitimate tax saving opportunities, the payment of additional federal and New Jersey taxes and interest, the payment of GRC's own fees, and the payment of fees to new attorneys and accountants to rectify

---

[11]

    *Id.* ¶ 128.

[12]

    *Id.* ¶¶ 129, 130.

[13]

    *Id.* ¶¶ 96-97, 120-121, 131, 133-35.

[14]

    *Id.* ¶¶ 131-34, 136.

[15]

    *Id.* ¶¶ 139-140.

GRC's negligence.[16]

GRC moves to dismiss the accounting malpractice and declaratory relief claims for failure to state a claim upon which relief may be granted, arguing (1) GRC was merely a tax preparer, and so had no duty to assess the viability of plaintiffs' tax shelter investments, (2) GRC cannot have caused plaintiffs' damages resulting from the Asian NPL Strategy, as GRC was not involved until after plaintiffs had decided to invest, and (3) plaintiffs cannot recover back taxes and interest as damages.[17]

## II.     *Standards Governing Motions to Dismiss*

In resolving a Rule 12(b)(6) motion, the Court accepts as true the factual allegations set forth in the complaint and draws all reasonable inferences in the plaintiffs' favor.[18]  "Dismissal is appropriate only if [plaintiffs] can prove no set of facts that would entitle [them] to relief."[19]  The question is not whether plaintiffs ultimately will prevail, but whether they are entitled to offer

---

[16]

*Id.* ¶¶ 204, 206-211.

[17]

GRC moved in the alternative for summary judgment under Rule 56, but did not provide a separate statement of undisputed facts and so did not satisfy the requirements of Local Rule 56.1.  Accordingly, the Court has not considered the affidavits submitted by either party or the documents attached to those affidavits, and treats GRC's motion as having been brought solely under Rule 12(b)(6).

[18]

*See, e.g., Levy v. Southbrook Int'l Inves., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002) (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).

[19]

*Id.* (citing *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998)); *see also Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000).

evidence to support their claims.[20]

### III.     The Merits

To state a claim for accounting malpractice, plaintiffs must allege (1) GRC had a duty to plaintiffs, (2) GRC breached that duty by not adhering to the standards of the accounting profession, (3) GRC's breach caused injury to plaintiffs, and (4) that injury resulted in recoverable damages.[21]

### A.     Standard of Care

GRC moves to dismiss plaintiffs' malpractice claim on the ground that it had no duty to look beyond the materials it was provided or to advise plaintiffs as to the viability of the Asian NPL Strategy because GRC served as plaintiffs' tax preparer, not their tax advisor.[22]

The argument that GRC was merely plaintiffs' tax preparer is contradicted by the

---

[20]

*See, e.g., Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995), *cert. denied*, 519 U.S. 808 (1996).

[21]

The elements are similar under New York and New Jersey law. *See, e.g., Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 15 (2d Cir. 2000) (applying New York law); *Ronson v. Talesnick, CPA*, 33 F. Supp. 2d 347, 358 (D.N.J. 1999) (applying New Jersey law). The law of the forum state governs where neither party alleges that the law of a different state would control and differs from New York law. *See, e.g., Vtech Holdings Ltd. v. PricewaterhouseCoopers*, 348 F. Supp. 2d 255, 262 n.48 (S.D.N.Y. 2001). Although plaintiffs briefly state in a footnote of their memorandum that the parties disagree as to which law governs, they state also that New Jersey law is the same on this point as that of New York, and do not analyze why New Jersey law should control. *See* Plaintiffs' Mem. at 4-5, n.2. The Court accordingly applies New York law.

[22]

*See* GRC Mem. at 12-14; GRC Reply Mem. at 5-10.

allegations of the Complaint, which assert that GRC agreed to provide plaintiffs with tax planning services, to assess "the tax risks associated with participation in the Asian NPL Strategy," and to advise plaintiffs as to "the proper tax treatment, for both federal and New Jersey tax purposes," for that strategy.[23]  It alleges further that GRC in fact did assess and review the strategy and its tax treatment, but failed to advise plaintiffs properly as to the correct tax approach.[24]  Thus, GRC is incorrect that the Complaint relies on a claim that "GRC had an implied duty to exceed the scope of its engagement," and its analysis of the duty of a tax preparer to investigate beyond provided materials is inapposite.[25]  The Complaint adequately alleges that GRC, as one of plaintiffs' tax advisors, had a duty to assess and evaluate the risks and treatment of the Asian NPL Strategy and that it in fact did analyze those risks and treatment, albeit improperly and in a departure from accepted standards of practice.[26]  That is all that is required at the pleading stage.

B.      Causation

GRC further moves to dismiss plaintiffs' claims for lack of causation.

Plaintiffs hired Brichke in November 2001, around the time they were considering investing in the Asian NPL Strategy, to provide tax planning services, to assess the tax risks associated with the Asian NPL Strategy, to advise as to the proper federal and state tax treatment of

---

[23]
        Cpt. ¶¶ 128-29.

[24]
        *Id*. ¶¶ 130, 132-33.

[25]
        GRC's Mem. at 13.

[26]
        *See, e.g.*, *Hydro Investors,* 227 F.3d at 15.

that strategy, and to prepare the Carrolls' personal 2001 and 2002 federal and state tax returns.[27] After Brichke was hired, the Carrolls made their first investments in the strategy on December 17 and 24, 2001.[28]  Brichke then became affiliated with GRC "in the first half of 2002," and GRC agreed to provide plaintiffs with the same services for which Brichke had been retained.[29]  The Carrolls' final investment on the strategy took place on July 19, 2002.[30]

GRC argues that it is impossible for it to have influenced plaintiffs' decision to invest in the Asian NPL Strategy or to have caused any harm stemming from that decision, such as additional federal and state taxes and interest and loss of legitimate tax saving opportunities, because GRC did not appear on the scene until after the investments were made.  Plaintiffs respond that when Brichke became affiliated with GRC in 2002, GRC assumed liability for his failures in 2001 to advise plaintiffs properly as to the viability and implications of the Asian NPL Strategy.  Plaintiffs argue further that since plaintiffs' last investment in the strategy took place on July 19, 2002, and Brichke became affiliated with GRC in the "first half of 2002," they have alleged adequately that GRC was involved directly at the time of that final investment.

We begin with the successor liability theory.  A corporation that acquires the assets

---

[27]
    Cpt. ¶ 128.

[28]
    *Id.* ¶¶ 62, 69, 80.

[29]
    *Id.* ¶ 129.

[30]
    *Id.* ¶ 126.

of another corporation does not assume automatically the liabilities of the predecessor corporation.[31]

Liability is assumed if: (1) the buyer expressly or impliedly assumed the seller's tort liability, (2) there was a consolidation or *de facto* merger of seller and buyer, (3) the buyer was a mere continuation of the seller, or (4) the transaction was entered into fraudulently to escape such liability.[32] The Complaint does not contain allegations supporting the first, third, or fourth exceptions – the only allegation relating to GRC's assumption of Brichke's liability is that Brichke became "affiliated" with GRC in the first half of 2002.[33] While a generous reading of this allegation may suggest a *de facto* merger between GRC and Brichke, such a claim requires plaintiffs to allege: (1) continuity of ownership between buyer and seller, (2) cessation of ordinary business operations and the dissolution of the seller as soon as possible, (3) the buyer's assumption of liabilities ordinarily necessary for the uninterrupted continuation of the seller's business, and (4) continuity of management, personnel, physical location, assets, and general business operation.[34] As the Complaint does not contain such allegations, it does not allege adequately a *de facto* merger. Without such an allegation, plaintiffs have not alleged sufficiently any basis for successor liability on the part of GRC, which dooms plaintiffs' claims for damages stemming from their first two

---

[31]

See, e.g., Peralta v. WHM Tool Group, Inc., 2005 WL 2002454, *3 (E.D.N.Y. Aug. 19, 2005) (citing New York law).

[32]

See id.; see also Schumacher v. Richards Shears Co., Inc., 59 N.Y.2d 239, 245, 464 N.Y.S.2d 437, 440 (1983).

[33]

Cpt. ¶ 129.

[34]

See, e.g., New York City Asbestos Litig., 15 A.D.3d 254, 255-56 789 N.Y.S.2d 484, 486, ( 1st Dept. 2005).

investments in the Asian NPL Strategy. But this does not dispose of all of plaintiffs' claims. First, the Complaint is consistent with the possibility that GRC agreed to provide services before plaintiffs' final investment on July 19, 2002. In consequence, it is impossible at this stage to dismiss so much of plaintiffs' claims as relates to that investment.

Second, Plaintiffs argue that the Complaint alleges additional acts of malpractice against GRC, such as the independent error in the New Jersey tax return, and additional kinds of damage, including GRC's fees and those charged by its replacements.[35] Those aspects of plaintiffs' claims relate to allegations about GRC's conduct, not to Brichke's actions or plaintiffs' decision to invest in the Asian NPL Strategy, and so do not rely on a theory of successor liability. GRC does not contend otherwise.

Accordingly, the motion to dismiss is granted to the extent that plaintiffs hold GRC liable for plaintiffs' decisions to invest in the Asian NPL Strategy on December 17 and 24, 2001. This encompasses plaintiffs' alleged damages from those investments in the Asian NPL Strategy itself, the respective additional federal and state taxes and federal interest incurred when the Asian NPL Strategy was disallowed, and the loss of legitimate tax saving opportunities when plaintiffs chose one strategy over another.[36]

C.      *Recovery of Interest on Additional Assessed Taxes*

Plaintiffs seek to recover the additional federal and New Jersey taxes they have paid,

---

[35]      *See* Cpt. ¶¶ 138, 140-41; Section III.C, *infra*.

[36]      Cpt. ¶¶ 211, 266.

as well as interest on those taxes.[37]  Although the motion to dismiss is granted on other grounds as

to plaintiffs' claims to additional state and federal taxes and interest stemming from their 2001

investments,[38] those damage claims survive as to the July 19, 2002 investment.  Moreover, plaintiffs

have an independent basis for their claim to interest assessed by New Jersey.  They allege GRC,

when preparing the Carrolls' individual New Jersey tax returns, improperly offset gains and losses

of different types of entities.[39]  Thus, according to the Complaint, even had the Asian NPL Strategy

been a valid tax shelter, GRC negligently included it on the Carrolls' New Jersey tax returns and,

on that independent ground, they seek to recover the interest charged by New Jersey on the

additionally assessed taxes.

GRC argues that, under New York law, plaintiffs cannot recover taxes or interest as

damages.  Plaintiffs respond that they may recover those damages under New Jersey law and that

New Jersey law should apply.

A federal court exercising its supplemental jurisdiction over state law claims applies

the choice of law rules of the forum state.[40]  Accordingly, this Court applies New York choice of law

rules to determine which state's law will govern the damages recovery issue.

When confronted with a torts choice of law issue, New York courts conduct an

"interest analysis," assessing which of the competing jurisdictions has the greatest interest in seeing

---

[37]   *Id.*

[38]   *See* Section III.B, *supra*.

[39]   Cpt. ¶ 140.

[40]   *See, e.g., Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989).

its law applied to the matter at issue.[41]  Where the conflict concerns a loss-allocating rule that "prohibit[s], assign[s], or limit[s] liability after the tort occurs,"[42] rather than a conduct-regulating rule establishing liability, the interest analysis is conducted in accordance with the principles set forth in *Neumeier v. Kuehner*.[43]  Limiting recovery of taxes and interest is loss-allocating in nature, as it limits liability after the malpractice has occurred.  The *Neumeier* framework therefore applies here.[44]

     *Neumeier* provides three guidelines for courts considering the interests of the competing jurisdictions.  The first applies when the parties share a domicile, the second when the parties are domiciled in different states and the law of each state is favorable to its respective litigant, and the third in all other split-domicile scenarios.[45]  Here, plaintiffs are residents of New Jersey, the law of which supports their recovery of interest,[46] while GRC is a resident of New York, which does not allow for such recovery and so favors GRC.[47]  Accordingly, the second *Neumeier* principle

---

[41]  *See, e.g., Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 312 (1994).

[42]  *Id*. at 522, 620 N.Y.S.2d at 313; *see also Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 199-202, 491 N.Y.S.2d 90, 96-98 (1985).

[43]  31 N.Y.2d 121, 127-29, 335 N.Y.S.2d 64, 69-71 (1972).

[44]  *See, e.g., Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber*, 407 F.3d 34, 49-50 (2d Cir. 2005).

[45]  *See Neumeier*, 31 N.Y.2d at 128, 335 N.Y.S.2d at 70; *see also Stichting*, 407 F.3d at 50.

[46]  *See Ronson*, 33 F. Supp. 2d at 354.

[47]  *See* Cpt. ¶¶ 4, 5, 25.  For choice of law analysis, a corporation's domicile is the state in which it maintains its principal place of business.  *See, e.g., Elson v. Defren*, 283 A.D.2d 109, 116, 726 N.Y.S.2d 407, 413 (1st Dept. 2001).

applies, as the parties agree in their memoranda of law.[48]

In situations covered by the second *Neumeier* principle, the locus of the tort determines which state's law applies.[49] The locus of a tort is "where the last event necessary to make an actor liable occurred."[50] GRC argues that the last necessary event was the preparation of the Carrolls' tax returns, which took place at GRC's office in New York.[51] Plaintiffs counter that the last necessary event was the harm suffered by plaintiffs, which was felt at their residence in New Jersey.[52] Plaintiffs are correct. "[W]hen the defendant's negligent conduct occurs in one jurisdiction and the [plaintiffs'] injuries are suffered in another," the last event necessary for the defendant's liability, and thus for the locus of the tort, is "where the plaintiffs' injuries occurred."[53] According to the Complaint, plaintiffs reside in New Jersey, and suffered the tax and interest assessment in that state.[54] Therefore, under New York's choice of law rules, New Jersey law applies to this issue.

The New Jersey Supreme Court has not considered whether a plaintiff can recover

---

[48]

    *See* GRC's Mem. at 19-20; Plaintiffs' Mem. at 10-11.

[49]

    *See Neumeier*, 31 N.Y.2d at 128, 335 N.Y.S.2d at 70.

[50]

    *See Schultz*, 65 N.Y.2d at 195, 491 N.Y.S.2d at 95.

[51]

    *See* GRC's Mem. at 21.

[52]

    *See* Plaintiffs' Mem. at 11-12.

[53]

    *Schultz*, 65 N.Y.2d at 195, 491 N.Y.S.2d at 95. *See also, e.g., Krock v. Lipsay*, 97 F.3d 640, 646 (2d Cir. 1996); *Seippel v. Jenkins & Gilchrist*, P.C., 341 F. Supp. 2d 363, 377 (S.D.N.Y. 2004).

[54]

    *See* Cpt., ¶¶ 4, 5.

back taxes or interest.  However, a federal district court has predicted that New Jersey would permit the recovery of interest, in keeping with its adoption of the collateral source and benefits rules.[55] New Jersey's adoption of the collateral source rule was based on its public policy of preventing tortfeasors from benefitting from the "generosity of a third party or the ingenuity of the plaintiff."[56] Under this rule, a plaintiff's recovery from a tortfeasor generally is not barred because he or she has received compensation from another source.[57]  The benefits rule, in turn, applies when a defendant's tortious conduct has both caused harm to and conferred a benefit on a plaintiff.[58]  When this dual effect occurs, the benefits rule permits the value of the benefit conferred to be considered in mitigation of damages.[59]  As the district court concluded,

> "[c]onstruing those rules together reflects the principle that a harmed plaintiff is permitted to recover for the wrongdoing of a tortfeasor, but that the plaintiff's recovery should be reduced by any benefits recovered from the wrongdoers' actions . . denying recovery of IRS interest from a negligent accountant permits the tortfeasor to benefit from the presumption that a harmed taxpayer has been or should have been ingenious enough to (1) maintain a sum of money that he would have otherwise had to pay over to the IRS and (2) invest that money in a manner in which he earned interest in an amount comparable to the interest rate charged by the IRS."[60]

The district court then held that, in keeping with New Jersey's adoption of the benefits rule, a

---

[55]

See *Ronson*, 33 F. Supp. 2d at 354-56.

[56]

*Id*. at 354.

[57]

*Id*.

[58]

*Id*.

[59]

*Id*.

[60]

*Id*. at 355.

defendant accountant should be permitted in turn to come forward with evidence of how the plaintiff client had benefitted from the malpractice, to reduce the plaintiff's recovery.[61]

The prediction of the district court is persuasive as to recovery of interest. Plaintiffs argue that the court's analysis should be extended to permit the recovery of back taxes as well. GRC did not brief this issue and conceded in its reply memorandum that its only basis for this aspect of its motion to dismiss was the initial choice of law analysis, and not whether New Jersey in fact would permit recovery of taxes or interest in this situation.[62] Accordingly, the motion to dismiss plaintiffs' claim for recovery of taxes and interest is denied.

*IV.        Conclusion*

GRC's motion to dismiss is granted to the extent that plaintiffs' claims for damages stemming from the December 17 and 24, 2001 investments in the Asian NPL Strategy are dismissed. It is denied in all other respects.

SO ORDERED.

Dated: September 29, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[61]

*Id.*

[62]

*See* GRC Reply Mem. at 2-3.