UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
KENNETH CARROLL, et al.,

        Plaintiffs,

  -against-                                      05 Civ. 391 (LAK)

LEBOEUF, LAMB, GREENE & MACRAE,
LLP, et al.,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

> Blair C. Fensterstock
> Matthew J. Wojtkowiak
> FENSTERSTOCK & PARTNERS LLP
> *Attorneys for Plaintiffs*
>
> Daniel T. Bernhard
> Stewart H. Foreman
> FREELAND COOPER & FOREMAN LLP
> *Attorneys for Defendants Chenery Associates, Inc., Chenery Management, Inc., and Sussex Financial Services, Inc.*

LEWIS A. KAPLAN, *District Judge.*

        This is an action by plaintiffs for, among other things, alleged fraud and negligent misrepresentation in the inducement of their participation in an allegedly abusive tax shelter. The action has been resolved with respect to all defendants except Chenery Associates, Inc., Chenery Management, Inc. and Sussex Financial Services, Inc. (collectively, "Chenery"). Chenery, which

allegedly was a promoter of the tax shelter scheme in which the plaintiffs "invested," moves for summary judgment dismissing the complaint.

*Background*

Kenneth Carroll sold his business for a $50 million profit in October 2001. In order to manage his new wealth, Mr. Carroll, his wife Elizabeth Carroll and Carroll Capital Holdings LLC ("plaintiffs") hired Crestone Capital Advisors, LLC ("Crestone") to serve as their financial advisors and recommend both investment and tax minimization opportunities.[1] Crestone in turn referred plaintiffs to myCFO, a company that provides "investment advisory, brokerage and consulting services" and "investment and estate planning opportunities."[2] Crestone informed plaintiffs that myCFO was offering a tax shelter "investment" known as the Asian non-performing loans ("NPL") strategy and encouraged plaintiffs to speak with myCFO representatives about it.[3]

MyCFO essentially operated as a financial advisor and promoter of tax products and shelters, but did not itself sell them.[4] To that end, myCFO worked with Chenery, which designed and sold the NPL strategy along with other tax products. Chenery was not organized to deal directly with individual "investors" and did not market its products to the public. Instead, Chenery relied on

---

[1] Rule 56.1 St. ¶¶ 1-2; Bernhard Decl. Ex. D at 39:2-14.

[2] Bernhard Decl. Ex. E at 128:3-11; Ex. HH at KCB 670.

[3] *Id.* Ex E at 128:3-11.

[4] *Id.* Ex. HH at KCB 672.

financial advisors like myCFO to recommend its NPL strategy to individuals.[5]

The details of how the NPL program worked to provide tax deferrals or deductions to "investors" are not important for the resolution of this motion. Suffice it to say that Chenery purchased non-performing loans from financial institutions in South Korea and China. It then pooled the loans and established a non-U.S. limited liability corporation ("LLC") to which it contributed them. Following a series of transactions, the U.S. investor purchased the majority of the LLC's interest in the loans. A loan servicer attempted to collect cash from the loan debtors, and eventually the loans were swapped for loans of other investors or sold, triggering a loss to support the desired tax deduction or deferral.[6]

Chenery retained several law firms to perform due diligence on the loan portfolios that it was interested in purchasing and to provide legal analysis of the NPL program.[7] In particular, it hired LeBoeuf, Lamb, Greene & McCrae LLP ("LeBoeuf Lamb") to provide legal analysis and an opinion as to whether participants would be protected from penalties in the event the Internal Revenue Service ("IRS") successfully challenged tax deductions or deferrals based on the NPL strategy.[8] It retained also Sidley Austin Brown & Wood LLP ("Sidley Austin") to perform due diligence work.[9]

---

[5] Hahn Decl. ¶¶ 14-15.

[6] Id. ¶ 9; Bernhard Decl. Ex. DD.

[7] Hahn Decl. ¶¶ 11-13.

[8] Id. ¶ 12.

[9] Id. ¶¶ 11, 13

4

On myCFO's recommendation, plaintiffs too retained LeBoeuf Lamb and Sidley Austin to provide counsel regarding their participation in the NPL strategy.[10] Both firms noted in their engagement letters that they previously had represented Chenery, but did not state specifically that they had provided assistance to it regarding the NPL strategy.[11] LeBoeuf Lamb advised plaintiffs generally about the structure of the NPL program and explained the legal and market risks involved.[12] Sidley Austin provided plaintiffs with a letter analyzing relevant law as applied to the NPL transaction and opining that "there is a greater than 50 percent likelihood that the tax treatment will be upheld if challenged by the IRS, [and that] the IRS should not be successful" in imposing penalties against participants for tax positions taken with respect to the NPL strategy.[13] LeBoeuf Lamb then reviewed Sidley Austin's opinion and provided a second opinion letter affirming Sidley Austin's conclusion.[14]

Plaintiffs participated in the NPL program and paid myCFO and Chenery a combined total of over $1.1 million to do so.[15] Plaintiffs then took a tax position based on the NPL strategy

---

[10] Bernhard Decl. Ex. Z; *Id.* Ex. AA; *Id.* Ex. BB.

[11] *Id.* Ex. Z at KCB 84; *Id.* Ex. BB at KCB 707.

[12] *Id.* Ex. CC.

[13] *Id.* Ex. DD at 837.

[14] *Id.* Ex. FF.

[15] Rule 56.1 St. ¶ 47.

Plaintiffs paid Sidley Austin and LeBoeuf Lamb an additional $330,000 in fees for their legal advice.

when they filed their 2001 federal income tax returns in October 2002.[16] A little over a year later, plaintiffs filed an amended 2001 federal tax return that deleted the NPL deduction and paid the resulting interest and additional taxes.[17] At the time plaintiffs did so, they had not been audited by the IRS, nor had the IRS indicated an intent to audit them.[18]

Plaintiffs then sued *inter alia* Chenery, myCFO, LeBoeuf Lamb and Sidley Austin alleging that they had caused plaintiffs to participate in the NPL strategy and to take tax positions in reliance on that strategy when they knew or should have known that the IRS would not accept those positions. Plaintiffs sought compensatory and punitive damages, recovery of fees paid to defendants, attorneys' fees and costs. The case has been resolved as to all defendants except Chenery, which seeks summary judgment dismissing the remaining claims.[19]

*Discussion*

A.   Legal Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[20] The Court must view the facts in the light

---

[16]  *Id.* ¶ 58; Bernhard Decl. Ex. E at 241:17-242:11.

[17]  Bernhard Decl. Ex. D 398:2-15; *Id.* Ex. E 385:4-16; *Id.* Ex. SS

[18]  *Id.* Ex. E at 385:4-25.

[19]  DI 252.

[20]  *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000).

6

most favorable to the nonmoving party,[21] and the moving party has the burden of demonstrating the absence of a genuine issue of material fact.[22]  Where the burden of proof at trial would fall on the nonmoving party, however, it ordinarily is sufficient for the movant to point to a lack of evidence on an essential element of the nonmovant's claim.[23]  In that event, the nonmoving party must come forward with admissible evidence[24] sufficient to raise a genuine issue of fact for trial or suffer an adverse judgment.[25]

B.          *Prior Arbitration Proceeding*

The parties previously engaged in an arbitration proceeding before the American Arbitration Association ("AAA") in an attempt to resolve this matter.  There, defendants moved for summary judgment, but the arbitration panel denied the motion.  Plaintiffs contend that this Court should give preclusive effect to the panel's denial of defendants' motion because the earlier motion was substantially identical to the motion now before the Court.[26]

---

[21] *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997).

[22] *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

[23] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001).

[24] *See, e.g.*, *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001).

[25] *See, e.g.*, *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

[26] Pl. Br. at 6-8.

7

An arbitration decision may preclude a litigant from pursuing a substantially identical claim or issue before a federal court.[27] However, the doctrines of issue and claim preclusion apply only where there has been a final judgment on the merits.[28] They are thus inapplicable to a denial of a summary judgment motion, which is not a final order.[29]

C.   Choice of Law

Defendants seek summary judgment dismissing plaintiffs' claims for fraud, aiding and abetting fraud, negligent misrepresentation and unjust enrichment. A federal court exercising its supplemental jurisdiction over state law claims such as those asserted here first must determine which state's law will govern.[30] To do so, a court applies the choice of law rules of the forum state.[31]

"Under New York choice-of-law rules, the first step of the analysis is to determine whether there is a substantive conflict between the laws of the relevant choices."[32] "In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and

---

[27] *Bear Stearns & Co., Inc. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005).

[28] *Id.*; *Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 639 (2d Cir. 1987); RESTATEMENT OF JUDGMENTS (SECOND) §§ 13, 27 (1982).

[29] *Kay-R Elec. Corp. v. Stone & Webster Const. Co., Inc.*, 23 F.3d 55, 59 (2d Cir. 1994); *Milltex Indus. Corp. v. Jacquard Lace Co., Ltd.*, 922 F.2d 164, 167 (2d Cir. 1991).

[30] *See, e.g.*, *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir.1989).

[31] *Id.*

[32] *Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC*, 446 F. Supp.2d 163, 191 (S.D.N.Y. 2006).

8

if New York law is among the relevant choices, New York courts are free to apply it."[33]

In this case, although plaintiffs rely on New Jersey law and defendants cite New York law, neither party asserts that the laws of New York and New Jersey are materially different with respect to the claims at issue here.[34] Moreover, the Court finds that New York and New Jersey law applicable to plaintiffs' claims is substantially the same. For convenience, the Court therefore will apply New York law, but would reach the same result even if it applied New Jersey law.[35]

D.     *Plaintiffs' Fraud Claims*

To establish a claim for common law fraud in New York, plaintiffs must show (1) an omission or misrepresentation of a material fact, (2) which defendants knew to be false when made, (3) which defendants made with the intent to induce plaintiffs' reliance, (4) upon which plaintiffs reasonably relied, and (5) which caused injury to plaintiffs.[36] Negligent misrepresentation

---

[33] *Inter'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir.2004).

[34] Indeed, neither party conducted any choice of law analysis. Plaintiffs indicated in a footnote that they relied on New Jersey law because the Court in a prior decision in this case applied the law of that state. Pl. Br. at 12 n.10. There, however, the Court concluded that New Jersey law applied only to whether plaintiffs could recover damages against a defendant who no longer is a party to the case. The Court stated expressly that its choice of law analysis applied only to the damages issue. *See Carroll v. LeBoeuf, Lamb, Greene & MacRae, LLP*, 392 F. Supp.2d 261, 629-30 (S.D.N.Y. 2005).

Defendants did not explain the basis for their selection of New York law.

[35] *See, e.g.*, *Pension Committee*, 446 F. Supp.2d at 191; *Interstate Foods, Inc. v. Lehmann*, No. 06 Civ. 13469 (JGK), 2008 WL 4443850, at *2 (S.D.N.Y. Sept. 30, 2008).

[36] *Shovak v. Long Island Commercial Bank*, 50 A.D.3d 1118, 1120, 858 N.Y.S.2d 660, 663 (2d Dep't 2008); *see also Jewish Ctr of Sussex County v. Whale*, 432 A.2d 521, 524, 86 N.J. 619, 624 (1981) (New Jersey law).

"involves most of the same elements as fraud, with a negligence standard substituted for the *scienter* requirement."[37] The Court's analysis therefore will be the same as to all three of the remaining claims that sound in fraud.

       1.    *Fraud Based on Alleged Misrepresentations by Defendants Other Than Chenery*

Plaintiffs rest their claims of fraud upon a number of alleged misrepresentations and omissions attributable both to Chenery and to LeBoeuf Lamb, Sidley Austin and myCFO, among others.[38] Plaintiffs, however, have shown no basis by which Chenery may be held liable for the alleged misstatements and omissions of others.

In the amended complaint, plaintiffs allege that LeBoeuf Lamb, Sidley Austin and myCFO were co-conspirators with, or agents of Chenery.[39] Under either or both the law of conspiracy and agency, an actor may be held liable for the actions, including the misstatements, of another.[40] Plaintiffs, however, do not appear to pursue these theories here and, in any event, they

---

[37] *Mia Shoes, Inc. v. Republic Factors, Corp.*, No. 96 Civ. 7974 (TPG), 1997 WL 525401, at *3 (S.D.N.Y. Aug. 21, 1997) (applying New York law); *Rotterdam Ventures, Inc. v. Ernst & Young LLP*, 300 A.D.2d 963, 964, 752 N.Y.S.2d 746, 747 (3rd Dep't 2002); *see also McClellan v. Feit*, 870 A.2d 644, 650, 376 N.J. Super. 305, 317 (Sup. Ct. App. Div. 2005).

[38] Pl. Br. at 11-13.

[39] *See, e.g.*, Am. Cpt. ¶¶ 27, 29, 163, 172, 213, 235.

[40] *See, e.g.*, *Bedessee Imports, Inc. v. Cook, Hall & Hyde, Inc.*, 45 A.D.3d 792, 795, 847 N.Y.S.2d 151, 155 (2d Dep't 2007) (principal vicariously liable for "wrongful or negligent acts and misrepresentations of its agent when made within the general or apparent scope of the agent's authority"); *Keller v. Levy*, 265 A.D. 723, 724, 40 N.Y.S.2d 580, 581(1st Dep't 1943) (allegation of conspiracy is useful in order to "render all defendants liable for each other's acts in furtherance thereof, and thus broaden liability").

present no evidence in support of the existence of a conspiracy or agency relationship among defendants. The alleged misstatements and omissions by parties other than Chenery therefore do not support plaintiffs' fraud claims against Chenery.

  2.  *Fraud Based on Alleged Misrepresentations by Chenery*

Plaintiffs argue also that Chenery itself made three material misstatements or omissions upon which plaintiffs relied to their detriment.

The first relates to the independence of the law firms that plaintiffs retained to assess the NPL strategy on their behalf. Plaintiffs received ostensibly objective legal opinions from the law firms LeBoeuf Lamb and Sidley Austin as to the likelihood that the NPL strategy would withstand a challenge by the IRS.[41] They contend, however, that neither LeBoeuf Lamb nor Sidley Austin actually were independent tax advisors because the firms had advised and assisted Chenery in developing and promoting the NPL strategy. They argue that Chenery is liable because it misrepresented or failed to disclose that fact.[42]

Taxpayer reliance on competent advice from an independent tax professional may preclude the imposition of penalties.[43] Conversely, then, if a law firm had an interest in the sale of

---

[41]   *See* Bernhard Decl. Ex. DD (Sidley Austin opinion letter dated December 12, 2001 addressed to Mr. Carroll); Ex. FF (LeBoeuf Lamb opinion letter dated June 7, 2002 addressed to Mr. Carroll).

[42]   Pl. Br. at 9, 20-21.

[43]   *See, e.g., Klamath Strategic Investment Fund v. United States*, No. 07-40861, --- F.3d ---, 2009 WL 1353118, at *8 (5th Cir. May 15, 2009); *Stobie Creek Investments, LLC v. United States*, 82 Fed. Cl. 636, 718-20 (2008); *Neonatology Associates, P.A. v. Comm'r*, 299 F.3d 221, 234 (3d Cir.2002); *Durrett v. Comm'r*, 71 F.3d 515, 518 (5th Cir.1996).

a particular tax product, a court could conclude that its opinion would not provide protection from IRS penalties. In order to demonstrate that Chenery misled plaintiffs as to Sidley Austin and LeBoeuf Lamb's independence, plaintiffs rely upon a statement contained in a copy of a letter dated November 28, 2001, purportedly written by Chenery, signed by Chenery principal Roy E. Hahn and received by Mr. Carroll.[44] The purported copy, labeled Exhibit 11 to the Fensterstock Affidavit, stated that "Chenery has retained major New York law firms to advise [Chenery] on certain federal tax issues."[45] Plaintiffs argue that this partial disclosure obligated Chenery to identify the firms by name and disclose fully the nature of the firms' work on the NPL strategy for Chenery.[46]

Plaintiffs note correctly that under both New York and New Jersey law, even when there is no duty to speak, when one elects to speak one must tell the truth when it is apparent that another may rely reasonably on the statements made.[47] Plaintiffs' argument, however, relies on a statement by Chenery that is not properly considered on this motion. On defendants' unopposed motion, the Court excluded Exhibit 11 based on competency issues under Federal Rule of Civil Procedure 56, authentication issues under Federal Rule of Evidence 901 and the best evidence rule.[48]

---

[44] Fensterstock Aff. Ex. 11; *see* Pl. Br. at 14.

[45] Fensterstock Aff. Ex. 11 at KCC 1153.

[46] Pl. Br. at 12-13.

[47] *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Thermal Imaging, Inc. v. Sandgrain Sec., Inc.*, 158 F. Supp.2d 335, 346 (S.D.N.Y. 2001) (applying New York law); *Strawn v. Canuso*, 638 A.2d 141, 149, 271 N.J. Super. 88, 105 (Sup. Ct. 1994).

[48] *See Carroll v. LeBoeuf, Lamb, Greene & MacRae, L.L.P.*, No. 05 Civ. 0391(LAK), --- F. Supp.2d ---, 2009 WL 1286303 (S.D.N.Y. May 8, 2009).

12

There is thus no admissible evidence that Chenery made the alleged statements concerning the law firms.

Second, plaintiffs argue that Chenery misrepresented in promotional materials that plaintiffs would receive complete protection from any IRS penalties if they participated in a Chenery tax shelter transaction.[49] In an eleven page brochure promoting Chenery generally as a "tax solution" firm – but not the NPL strategy specifically – Chenery stated that "[e]ach tax plan arranged by Chenery Associates is backed by a favorable legal opinion addressed directly to the client. The opinion is in the form required by Treasury regulations to eliminate penalty risk for individuals."[50] Plaintiffs take this statement to be a representation that the opinion "*would* eliminate – not *should* eliminate – penalties for Mr. Carroll."[51]

Even assuming that the Chenery statement could be given the meaning plaintiffs ascribe to it,[52] there is no evidence that Mr. Carroll actually saw, let alone relied on, it. While plaintiffs state that "promotional materials [including the Chenery brochure] . . . were sent to Crestone and Mr. Carroll,"[53] they cite no evidence to support that assertion. Exhibit 10 to the

---

[49] Pl. Br. at 21.

[50] Fensterstock Aff. Ex. 10.

[51] Pl. Br. at 21.

[52] While arguably misleading, the statement does not say that the legal opinions would eliminate penalty risk for individuals, merely that they were in the correct form to do so. But as demonstrated below, the Court need not determine whether this was a "misstatement" upon which a claim of fraud may be based.

[53] *Id.*

Fensterstock affidavit contains the Chenery brochure and a letter from Chenery to Phil Groves at myCFO. There is no indication in the letter or anywhere else pointed to by plaintiffs that myCFO forwarded the brochure to anyone, including Mr. Carroll or Crestone. Mr. Fensterstock's affidavit states only that "Exhibit 10 . . . was produced by Plaintiffs."[54] It does not indicate whether it was in Carroll or Crestone's possession, let alone whether either of them read it prior to entering the NPL strategy. Moreover, even if the Court assumes that plaintiffs read the brochure, there is no evidence that they understood it to mean that they were protected completely from IRS penalties and relied on that understanding when deciding to invest in the NPL strategy. Indeed, there is evidence to the contrary, as Crestone advised Mr. Carroll that if he was audited and his defense failed, he risked "needing to pay the tax liability plus some interest and penalties."[55] Additionally, both law firms advised plaintiffs that they "should" be protected from IRS penalties, not that they would be.[56] There is thus no admissible evidence sufficient to prevent a finding that plaintiffs' relied on the statement contained in the Chenery brochure, let alone that they did so justifiably.

Third, plaintiffs contend that Chenery omitted to disclose certain facts about the NPL strategy which affected plaintiffs' ability to assess objectively the validity of that tax strategy.[57] In particular, plaintiffs argue that Chenery failed to mention (1) the fact that the loan swaps actually were trades among other investors in the NPL strategy and (2) that "the sale of the loans within three

---

[54] Fensterstock Aff. ¶ 16.

[55] Bernhard Decl. Ex. E at 100:11-22.

[56] *Id.* Ex. DD at 837; *Id.* Ex. FF at LB 3647

[57] Pl. Br. at 17-18, 22.

weeks of their acquisition [would] adversely impact[] the strategy's validity."[58] According to plaintiffs, both of these facts made it more likely that the IRS and ultimately the courts would disallow tax deductions or deferrals due to losses generated by these transactions.[59]

The failure to disclose material facts may be fraudulent where a duty to disclose exists.[60] Such a duty may arise out of a fiduciary or confidential relationship or where one voluntarily discloses information, among other situations.[61] Here, Chenery sent plaintiffs a memorandum describing the NPL strategy in detail. The memorandum provided also what it described as a "general discussion of certain of the federal income tax consequences" for "investors" in the strategy.[62] Despite containing warnings to potential investors that the "summary" discussion did "not address all of the tax consequences" that might be relevant to a particular individual, the memorandum nonetheless provided a detailed ten page description of the manner in which the NPL strategy likely would be treated by the IRS for federal tax purposes.[63] By providing plaintiffs with

---

[58] *Id.*

[59] *Id.* at 17.

[60] *Kaufman v. Cohen*, 307 A.D.2d 113, 120, 760 N.Y.S.2d 157, 165 (1st Dep't 2003); *see also United Jersey Bank v. Kensey*, 704 A.2d 38, 43, 306 N.J. Super. 540, 551 (Sup. Ct. A.D. 1997); 26 WILLISTON ON CONTRACTS § 69:17 (1993).

[61] *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (applying New York law); *see also Kaufman*, 307 A.D.2d at 120; *Kensey*, 704 A.2d at 44; 26 WILLISTON § 69:17

[62] Fensterstock Aff. Ex. 19 at KCC 1540-49; *see also id.* Ex. 12 (acknowledging Carroll and Crestone's receipt of Exhibit 19).

[63] *Id.* Ex. 19 at KCC 1540-49.

this memorandum, Chenery thus became responsible for any material omissions from the discussion of the tax considerations related to the NPL strategy.[64]

Identifying an omission is not, however, sufficient for plaintiffs' fraud claims to survive the motion for summary judgment.[65] Plaintiffs must demonstrate also that there is a genuine issue of material fact as to each of the remaining four elements. But they have failed to offer evidence sufficient to justify a finding that they were injured by any Chenery omission regarding its discussion of the tax consequences of the NPL strategy. Plaintiffs opted to file an amended tax return and pay the resulting additional taxes and interest rather than attempting to vindicate their original reporting position and retain the tax benefits resulting from their participation in the NPL strategy that they had claimed originally in their 2001 federal tax return.[66] Plaintiffs thus cannot demonstrate that they suffered an injury caused by defendants when they voluntarily decided to take a less risky approach on their tax return.

### E.   *Plaintiffs' Remaining Claims*

In addition to their claims sounding in fraud, plaintiffs assert an equitable claim based on a theory of unjust enrichment. They seek recision of their agreement to pay Chenery its fees,

---

[64] It therefore is unnecessary for the Court to decide whether Chenery had a fiduciary or confidential relationship with plaintiffs.

[65] The Court will assume for the purposes of this decision that the omissions were material.

[66] Bernhard Decl. Ex. D at 398:1-15.

16

recoupment of those fees or restitution in that amount.[67]

To establish a claim for unjust enrichment, plaintiffs must show: "that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."[68] Based on the above discussion of plaintiffs' claims sounding in fraud, the Court cannot say that equity "militate[s] against permitting" Chenery to retain the fees plaintiffs paid.

*Conclusion*

For the foregoing reasons, defendants' motion for summary judgment [docket item 252] dismissing the amended complaint is granted. The Clerk of Court is directed to close the case.

SO ORDERED.

Dated:   June 5, 2009

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[67] Am. Cpt. ¶¶ 260-263.

[68] *See Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (applying New York law); *see also VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526, 135 N.J. 539, 554 (1994).